ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1175 (L), 23-1222

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CITY OF PORT ISABEL, *et al.*,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

## PETITIONERS' ADDENDUM TO
## JOINT RULE 30(c) PROOF OPENING BRIEF

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Tom Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78723
424-346-3276
tom.gosselin@sierraclub.org

Lisa M. Diaz
Sierra Club
910 Julia Street,
New Orleans, LA 70113
305-336-2258
lisa.diaz@sierraclub.org

*Additional counsel listed on inside cover.*

Gilberto Hinojosa
531 E. St. Francis St.
Brownsville, Texas 78520
(956) 544-4218
ghinojosa@ghinojosalaw.net

*Attorney for City of Port Isabel*

Dated Dec. 13, 2023

# ADDENDUM TABLE OF CONTENTS

## Statutes

15 U.S.C. § 717b ................................................................................1

15 U.S.C. § 717f ................................................................................5

15 U.S.C. § 717r ................................................................................8

42 U.S.C. § 4332 .............................................................................11

## Regulations

18 C.F.R. § 380.1 ...........................................................................15

18 C.F.R. § 380.7 ...........................................................................16

18 C.F.R. § 380.10 .........................................................................17

18 C.F.R. § 380.12 .........................................................................19

40 C.F.R. § 1501.9 .........................................................................35

40 C.F.R. § 1501.12 .......................................................................38

40 C.F.R. § 1502.1 .........................................................................39

40 C.F.R. § 1502.8 .........................................................................40

40 C.F.R. § 1502.9 .........................................................................41

40 C.F.R. § 1502.14 .......................................................................43

40 C.F.R. § 1502.16 .......................................................................45

40 C.F.R. § 1502.21 .......................................................................47

40 C.F.R. § 1506.6 ...................................................................49

40 C.F.R. § 1506.11 .................................................................51

40 C.F.R. § 1508.1 ...................................................................53

## Standing

Guevara, Emma Declaration..............................................59

Hinojosa, Rebekah Declaration.........................................64

Hockema, Jared Declaration ...............................................74

Mancias, Juan Declaration...................................................82

Nuñez, Dina Declaration (Translated, English).................89

Rivas, Anthony Declaration (Translator) ..........................92

Rivas, Anthony Curriculum Vitae (Translator) ................93

Nuñez, Dina Declaration (Original, Spanish) ..................96

## Certificate of Service

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
 Title 15. Commerce and Trade
  Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717b

§ 717b. Exportation or importation of natural gas; LNG terminals

Effective: August 8, 2005
Currentness

**(a) Mandatory authorization order**

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

**(b) Free trade agreements**

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

  **(1)** the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

  **(2)** the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

**(c) Expedited application and approval process**

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

**001**

**(1)** the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

**(2)** the Clean Air Act (42 U.S.C. 7401 et seq.); or

**(3)** the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

**(1)** The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

**(2)** Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--

**(A)** set the matter for hearing;

**(B)** give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

**(C)** decide the matter in accordance with this subsection; and

**(D)** issue or deny the appropriate order accordingly.

**(3)(A)** Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find [1] necessary or appropriate.

**(B)** Before January 1, 2015, the Commission shall not--

**(i)** deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

**(ii)** condition an order on--

**(I)** a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

**002**

**(II)** any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

**(III)** a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

**(C)** Subparagraph (B) shall cease to have effect on January 1, 2030.

**(4)** An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

**(1)** In this subsection, the term "military installation"--

**(A)** means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

**(B)** does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

**(2)** The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

**(3)** The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

**CREDIT(S)**

(June 21, 1938, c. 556, § 3, 52 Stat. 822; Pub.L. 102-486, Title II, § 201, Oct. 24, 1992, 106 Stat. 2866; Pub.L. 109-58, Title III, § 311(c), Aug. 8, 2005, 119 Stat. 685.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 10485**

<Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957.>

**003**

**Performance of Functions Respecting Electric Power and Natural Gas Facilities Located on United States Borders**

**Section 1. (a)** The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

**(1)** To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

**(2)** To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

**(3)** Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

**(b)** In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

**Sec. 2.** [Deleted].

**Sec. 3.** The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

**Sec. 4.** All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

**Sec. 5.** Executive Order No. 8202 of July 13, 1939, is hereby revoked.

Notes of Decisions (47)

**Footnotes**

1    So in original. Probably should be "finds".

2    So in original. Probably should be "coordinates and consults".

15 U.S.C.A. § 717b, 15 USCA § 717b
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

**004**

🏳 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by  In re PennEast Pipeline Company, LLC,  3rd Cir.(N.J.),  Sep. 10, 2019

🏳 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

---

15 U.S.C.A. § 717f

§ 717f. Construction, extension, or abandonment of facilities

Currentness

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation,

**005**

and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

**(B)** In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

**(2)** The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

**(A)** natural gas sold by the producer to such person; and

**(B)** natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

**(1)** The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

# 006

**(2)** If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

**CREDIT(S)**

(June 21, 1938, c. 556, § 7, 52 Stat. 824; Feb. 7, 1942, c. 49, 56 Stat. 83; July 25, 1947, c. 333, 61 Stat. 459; Pub.L. 95-617, Title VI, § 608, Nov. 9, 1978, 92 Stat. 3173; Pub.L. 100-474, § 2, Oct. 6, 1988, 102 Stat. 2302.)

Notes of Decisions (857)

15 U.S.C.A. § 717f, 15 USCA § 717f
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

**007**

⚑ KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005

Currentness

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation,

**008**

USCA Case #23-1222    Document #2031422        Filed: 12/13/2023    Page 13 of 104

if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**009**

USCA Case #23-1222      Document #2031422      Filed: 12/13/2023      Page 14 of 104

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

**CREDIT(S)**

(June 21, 1938, c. 556, § 19, 52 Stat. 831; June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub.L. 109-58, Title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

Notes of Decisions (795)

15 U.S.C.A. § 717r, 15 USCA § 717r
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**010**

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version's Limitation Recognized by    Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers,   11th Cir.(Fla.),   Sep. 15, 2010

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 55. National Environmental Policy (Refs & Annos)
      Subchapter I. Policies and Goals (Refs & Annos)

---

42 U.S.C.A. § 4332

§ 4332. Cooperation of agencies; reports; availability of information;
recommendations; international and national coordination of efforts

Effective: June 3, 2023

Currentness

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** reasonably foreseeable environmental effects of the proposed agency action;

**(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

**(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

**011**

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

**(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document;

**(E)** make use of reliable data and resources in carrying out this chapter;

**(F)** consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;

**(G)** any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [1]

**012**

**(H)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(I)** consistent with the provisions of this chapter, recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(J)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(K)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(L)** assist the Council on Environmental Quality established by subchapter II of this chapter.

**CREDIT(S)**

(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424; Pub.L. 118-5, Div. C, Title III, § 321(a), June 3, 2023, 137 Stat. 38.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 13352**

<Aug. 26, 2004, 69 F.R. 52989>

**Facilitation of Cooperative Conservation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Purpose.** The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

**Sec. 2. Definition.** As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

**Sec. 3. Federal Activities.** To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

**013**

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**(a)** carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

**(i)** facilitates cooperative conservation;

**(ii)** takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

**(iii)** properly accommodates local participation in Federal decisionmaking; and

**(iv)** provides that the programs, projects, and activities are consistent with protecting public health and safety;

**(b)** report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

**(c)** provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

**Sec. 4. White House Conference on Cooperative Conservation.** The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

**(a)** convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

**(b)** ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

**Sec. 5. General Provision.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH

Notes of Decisions (5315)

**Footnotes**

1       So in original. The period probably should be a semicolon.

42 U.S.C.A. § 4332, 42 USCA § 4332
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**014**

Code of Federal Regulations
  Title 18. Conservation of Power and Water Resources
    Chapter I. Federal Energy Regulatory Commission, Department of Energy
      Subchapter W. Revised General Rules
        Part 380. Regulations Implementing the National Environmental Policy Act (Refs & Annos)

18 C.F.R. § 380.1

§ 380.1 Purpose.

Effective: February 1, 2012
Currentness

The regulations in this part implement the Federal Energy Regulatory Commission's procedures under the National Environmental Policy Act of 1969 (NEPA). These regulations supplement the regulations of the Council on Environmental Quality, 40 CFR parts 1500 through 1508. The Commission will comply with the regulations of the Council on Environmental Quality except where those regulations are inconsistent with the statutory requirements of the Commission.

**Credits**
[Order 756, 77 FR 4895, Feb. 1, 2012]

SOURCE: 52 FR 47910, Dec. 17, 1987; 53 FR 8177, March 14, 1988; 56 FR 23154, May 20, 1991; 56 FR 52397, Oct. 18, 1991; Order 603–A, 64 FR 54537, Oct. 7, 1999; Order 756, 77 FR 4894, Feb. 1, 2012, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4370h, 7101–7352; E.O. 12009, 3 CFR 1978 Comp., p. 142.

Notes of Decisions (8)

Current through Dec. 5, 2023, 88 FR 84676. Some sections may be more current. See credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**015**

Code of Federal Regulations
    Title 18. Conservation of Power and Water Resources
        Chapter I. Federal Energy Regulatory Commission, Department of Energy
            Subchapter W. Revised General Rules
                Part 380. Regulations Implementing the National Environmental Policy Act (Refs & Annos)

18 C.F.R. § 380.7

§ 380.7 Format of an environmental impact statement.

Currentness

In addition to the requirements for an environmental impact statement prescribed in 40 CFR 1502.10 of the regulations of the Council, an environmental impact statement prepared by the Commission will include a section on the literature cited in the environmental impact statement and a staff conclusion section. The staff conclusion section will include summaries of:

(a) The significant environmental impacts of the proposed action;

(b) Any alternative to the proposed action that would have a less severe environmental impact or impacts and the action preferred by the staff;

(c) Any mitigation measures proposed by the applicant, as well as additional mitigation measures that might be more effective;

(d) Any significant environmental impacts of the proposed action that cannot be mitigated; and

(e) References to any pending, completed, or recommended studies that might provide baseline data or additional data on the proposed action.

SOURCE: 52 FR 47910, Dec. 17, 1987; 53 FR 8177, March 14, 1988; 56 FR 23154, May 20, 1991; 56 FR 52397, Oct. 18, 1991; Order 603–A, 64 FR 54537, Oct. 7, 1999; Order 756, 77 FR 4894, Feb. 1, 2012, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4370h, 7101–7352; E.O. 12009, 3 CFR 1978 Comp., p. 142.

Notes of Decisions (6)

Current through Dec. 1, 2023, 88 FR 83869. Some sections may be more current. See credits for details.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**016**

---

Code of Federal Regulations
  Title 18. Conservation of Power and Water Resources
    Chapter I. Federal Energy Regulatory Commission, Department of Energy
      Subchapter W. Revised General Rules
        Part 380. Regulations Implementing the National Environmental Policy Act (Refs & Annos)

18 C.F.R. § 380.10

§ 380.10 Participation in Commission proceedings.

Effective: January 30, 2007

Currentness

(a) Intervention proceedings involving a party or parties—

(1) Motion to intervene.

(i) In addition to submitting comments on the NEPA process and NEPA related documents, any person may file a motion to intervene in a Commission proceeding dealing with environmental issues under the terms of § 385.214 of this chapter. Any person who files a motion to intervene on the basis of a draft environmental impact statement will be deemed to have filed a timely motion, in accordance with § 385.214, as long as the motion is filed within the comment period for the draft environmental impact statement.

(ii) Any person that is granted intervention after petitioning becomes a party to the proceeding and accepts the record as developed by the parties as of the time that intervention is granted.

(2)(i) Issues not set for trial-type hearing. An intervenor who takes a position on any environmental issue that has not yet been set for hearing must file a timely motion with the Secretary containing an analysis of its position on such issue and specifying any differences with the position of Commission staff or an applicant upon which the intervenor wishes to be heard at a hearing.

(ii) Issues set for trial-type hearing.

(A) Any intervenor that takes a position on an environmental issue set for hearing may offer evidence for the record in support of such position and otherwise participate in accordance with the Commission's Rules of Practice and Procedure. Any intervenor must specify any differences from the staff's and the applicant's positions.

(B) To be considered, any facts or opinions on an environmental issue set for hearing must be admitted into evidence and made part of the record of the proceeding.

**017**

USCA Case #23-1222      Document #2031422      Filed: 12/13/2023      Page 22 of 104

(iii) Commission pre-filing activities commenced under §§ 157.21 and 50.5 of this chapter, respectively, are not considered proceedings under part 385 of this chapter and are not open to motions to intervene. Once an application is filed under part 157 subpart A or part 50 of this chapter, any person may file a motion to intervene in accordance with §§ 157.10 or 50.10 of this chapter or in accordance with this section.

(b) Rulemaking proceedings. Any person may file comments on any environmental issue in a rulemaking proceeding.

**Credits**

[Order 689, 71 FR 69471, Dec. 1, 2006; 72 FR 198, Jan. 3, 2007]

SOURCE: 52 FR 47910, Dec. 17, 1987; 53 FR 8177, March 14, 1988; 56 FR 23154, May 20, 1991; 56 FR 52397, Oct. 18, 1991; Order 603–A, 64 FR 54537, Oct. 7, 1999; Order 756, 77 FR 4894, Feb. 1, 2012, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4370h, 7101–7352; E.O. 12009, 3 CFR 1978 Comp., p. 142.

Current through Dec. 1, 2023, 88 FR 83869. Some sections may be more current. See credits for details.

---

            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**018**

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                     2

> Code of Federal Regulations
>   Title 18. Conservation of Power and Water Resources
>     Chapter I. Federal Energy Regulatory Commission, Department of Energy
>       Subchapter W. Revised General Rules
>         Part 380. Regulations Implementing the National Environmental Policy Act (Refs & Annos)

18 C.F.R. § 380.12

§ 380.12 Environmental reports for Natural Gas Act applications.

Effective: February 1, 2012 to December 28, 2023

Currentness

<Text of section effective until Dec. 29, 2023.>

(a) Introduction.

(1) The applicant must submit an environmental report with any application that proposes the construction, operation, or abandonment of any facility identified in § 380.3(c)(2)(i). The environmental report shall consist of the thirteen resource reports and related material described in this section.

(2) The detail of each resource report must be commensurate with the complexity of the proposal and its potential for environmental impact. Each topic in each resource report shall be addressed or its omission justified, unless the resource report description indicates that the data is not required for that type of proposal. If material required for one resource report is provided in another resource report or in another exhibit, it may be incorporated by reference. If any resource report topic is required for a particular project but is not provided at the time the application is filed, the environmental report shall explain why it is missing and when the applicant anticipates it will be filed.

(3) The appendix to this part contains a checklist of the minimum filing requirements for an environmental report. Failure to provide at least the applicable checklist items will result in rejection of the application unless the Director of the Office of Energy Projects determines that the applicant has provided an acceptable reason for the item's absence and an acceptable schedule for filing it. Failure to file within the accepted schedule will result in rejection of the application.

(b) General requirements. As appropriate, each resource report shall:

(1) Address conditions or resources that might be directly or indirectly affected by the project;

(2) Identify significant environmental effects expected to occur as a result of the project;

(3) Identify the effects of construction, operation (including maintenance and malfunctions), and termination of the project, as well as cumulative effects resulting from existing or reasonably foreseeable projects;

**019**

USCA Case #23-1222   Document #2031422   Filed: 12/13/2023   Page 24 of 104

(4) Identify measures proposed to enhance the environment or to avoid, mitigate, or compensate for adverse effects of the project;

(5) Provide a list of publications, reports, and other literature or communications, including agency contacts, that were cited or relied upon to prepare each report. This list should include the name and title of the person contacted, their affiliations, and telephone number;

(6) Whenever this section refers to "mileposts" the applicant may substitute "survey centerline stationing" if so desired. However, whatever method is chosen should be used consistently throughout the resource reports.

(c) Resource Report 1—General project description. This report is required for all applications. It will describe facilities associated with the project, special construction and operation procedures, construction timetables, future plans for related construction, compliance with regulations and codes, and permits that must be obtained. Resource Report 1 must:

(1) Describe and provide location maps of all jurisdictional facilities, including all aboveground facilities associated with the project (such as: meter stations, pig launchers/receivers, valves), to be constructed, modified, abandoned, replaced, or removed, including related construction and operational support activities and areas such as maintenance bases, staging areas, communications towers, power lines, and new access roads (roads to be built or modified). As relevant, the report must describe the length and diameter of the pipeline, the types of aboveground facilities that would be installed, and associated land requirements. It must also identify other companies that must construct jurisdictional facilities related to the project, where the facilities would be located, and where they are in the Commission's approval process.

(2) Identify and describe all nonjurisdictional facilities, including auxiliary facilities, that will be built in association with the project, including facilities to be built by other companies.

(i) Provide the following information:

(A) A brief description of each facility, including as appropriate: Ownership, land requirements, gas consumption, megawatt size, construction status, and an update of the latest status of Federal, state, and local permits/approvals;

(B) The length and diameter of any interconnecting pipeline;

(C) Current 1:24,000/1:25,000 scale topographic maps showing the location of the facilities;

(D) Correspondence with the appropriate State Historic Preservation Officer (SHPO) or duly authorized Tribal Historic Preservation Officer (THPO) for tribal lands regarding whether properties eligible for listing on the National Register of Historic Places (NRHP) would be affected;

(E) Correspondence with the U.S. Fish and Wildlife Service (and National Marine Fisheries Service, if appropriate) regarding potential impacts of the proposed facility on federally listed threatened and endangered species; and

**020**

(F) For facilities within a designated coastal zone management area, a consistency determination or evidence that the owner has requested a consistency determination from the state's coastal zone management program.

(ii) Address each of the following factors and indicate which ones, if any, appear to indicate the need for the Commission to do an environmental review of project-related nonjurisdictional facilities.

(A) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

(B) Whether there are aspects of the nonjurisdictional facility in the immediate vicinity of the regulated activity which uniquely determine the location and configuration of the regulated activity.

(C) The extent to which the entire project will be within the Commission's jurisdiction.

(D) The extent of cumulative Federal control and responsibility.

(3) Provide the following maps and photos:

(i) Current, original United States Geological Survey (USGS) 7.5–minute series topographic maps or maps of equivalent detail, covering at least a 0.5–mile–wide corridor centered on the pipeline, with integer mileposts identified, showing the location of rights-of-way, new access roads, other linear construction areas, compressor stations, and pipe storage areas. Show nonlinear construction areas on maps at a scale of 1:3,600 or larger keyed graphically and by milepost to the right-of-way maps.

(ii) Original aerial images or photographs or photo-based alignment sheets based on these sources, not more than 1 year old (unless older ones accurately depict current land use and development) and with a scale of 1:6,000 or larger, showing the proposed pipeline route and location of major aboveground facilities, covering at least a 0.5 mile–wide corridor, and including mileposts. Older images/photographs/alignment sheets should be modified to show any residences not depicted in the original. Alternative formats (e.g., blue-line prints of acceptable resolution) need prior approval by the environmental staff of the Office of Energy Projects.

(iii) In addition to the copy required under § 157.6(a)(2) of this chapter, applicant should send two additional copies of topographic maps and aerial images/photographs directly to the environmental staff of the Office of Energy Projects.

(4) When new or additional compression is proposed, include large scale (1:3,600 or greater) plot plans of each compressor station. The plot plan should reference a readily identifiable point(s) on the USGS maps required in paragraph (c)(3) of this section. The maps and plot plans must identify the location of the nearest noise-sensitive areas (schools, hospitals, or residences) within 1 mile of the compressor station, existing and proposed compressor and auxiliary buildings, access roads, and the limits of areas that would be permanently disturbed.

**021**

(5)(i) Identify facilities to be abandoned, and state how they would be abandoned, how the site would be restored, who would own the site or right-of-way after abandonment, and who would be responsible for any facilities abandoned in place.

(ii) When the right-of-way or the easement would be abandoned, identify whether landowners were given the opportunity to request that the facilities on their property, including foundations and below ground components, be removed. Identify any landowners whose preferences the company does not intend to honor, and the reasons therefore.

(6) Describe and identify by milepost, proposed construction and restoration methods to be used in areas of rugged topography, residential areas, active croplands, sites where the pipeline would be located parallel to and under roads, and sites where explosives are likely to be used.

(7) Unless provided in response to Resource Report 5, describe estimated workforce requirements, including the number of pipeline construction spreads, average workforce requirements for each construction spread and meter or compressor station, estimated duration of construction from initial clearing to final restoration, and number of personnel to be hired to operate the proposed project.

(8) Describe reasonably foreseeable plans for future expansion of facilities, including additional land requirements and the compatibility of those plans with the current proposal.

(9) Describe all authorizations required to complete the proposed action and the status of applications for such authorizations. Identify environmental mitigation requirements specified in any permit or proposed in any permit application to the extent not specified elsewhere in this section.

(10) Provide the names and mailing addresses of all affected landowners specified in § 157.6(d) and certify that all affected landowners will be notified as required in § 157.6(d).

(d) Resource Report 2—Water use and quality. This report is required for all applications, except those which involve only facilities within the areas of an existing compressor, meter, or regulator station that were disturbed by construction of the existing facilities, no wetlands or waterbodies are on the site and there would not be a significant increase in water use. The report must describe water quality and provide data sufficient to determine the expected impact of the project and the effectiveness of mitigative, enhancement, or protective measures. Resource Report 2 must:

(1) Identify and describe by milepost perennial waterbodies and municipal water supply or watershed areas, specially designated surface water protection areas and sensitive waterbodies, and wetlands that would be crossed. For each waterbody crossing, identify the approximate width, state water quality classifications, any known potential pollutants present in the water or sediments, and any potable water intake sources within 3 miles downstream.

(2) Compare proposed mitigation measures with the staff's current "Wetland and Waterbody Construction and Mitigation Procedures," which are available from the Commission Internet home page or the Commission staff, describe what proposed alternative mitigation would provide equivalent or greater protection to the environment, and provide a description of site- specific construction techniques that would be used at each major waterbody crossing.

**022**

USCA Case #23-1222    Document #2031422    Filed: 12/13/2023    Page 27 of 104

(3) Describe typical staging area requirements at waterbody and wetland crossings. Also, identify and describe waterbodies and wetlands where staging areas are likely to be more extensive.

(4) Include National Wetland Inventory (NWI) maps. If NWI maps are not available, provide the appropriate state wetland maps. Identify for each crossing, the milepost, the wetland classification specified by the U.S. Fish and Wildlife Service, and the length of the crossing. Include two copies of the NWI maps (or the substitutes, if NWI maps are not available) clearly showing the proposed route and mileposts directed to the environmental staff. Describe by milepost, wetland crossings as determined by field delineations using the current Federal methodology.

(5) Identify aquifers within excavation depth in the project area, including the depth of the aquifer, current and projected use, water quality and average yield, and known or suspected contamination problems.

(6) Describe specific locations, the quantity required, and the method and rate of withdrawal and discharge of hydrostatic test water. Describe suspended or dissolved material likely to be present in the water as a result of contact with the pipeline, particularly if an existing pipeline is being retested. Describe chemical or physical treatment of the pipeline or hydrostatic test water. Discuss waste products generated and disposal methods.

(7) If underground storage of natural gas is proposed:

(i) Identify how water produced from the storage field will be disposed of, and

(ii) For salt caverns, identify the source locations, the quantity required, and the method and rate of withdrawal of water for creating salt cavern(s), as well as the means of disposal of brine resulting from cavern leaching.

(8) Discuss proposed mitigation measures to reduce the potential for adverse impacts to surface water, wetlands, or groundwater quality to the extent they are not described in response to paragraph (d)(2) of this section. Discuss the potential for blasting to affect water wells, springs, and wetlands, and measures to be taken to detect and remedy such effects.

(9) Identify the location of known public and private groundwater supply wells or springs within 150 feet of proposed construction areas. Identify locations of EPA or state-designated sole-source aquifers and wellhead protection areas crossed by the proposed pipeline facilities.

(e) Resource Report 3—Fish, wildlife, and vegetation. This report is required for all applications, except those involving only facilities within the improved area of an existing compressor, meter, or regulator station. It must describe aquatic life, wildlife, and vegetation in the vicinity of the proposed project; expected impacts on these resources including potential effects on biodiversity; and proposed mitigation, enhancement or protection measures. Resource Report 3 must:

(1) Describe commercial and recreational warmwater, coldwater, and saltwater fisheries in the affected area and associated significant habitats such as spawning or rearing areas and estuaries.

**023**

(2) Describe terrestrial habitats, including wetlands, typical wildlife habitats, and rare, unique, or otherwise significant habitats that might be affected by the proposed action. Describe typical species that have commercial, recreational, or aesthetic value.

(3) Describe and provide the acreage of vegetation cover types that would be affected, including unique ecosystems or communities such as remnant prairie or old-growth forest, or significant individual plants, such as old-growth specimen trees.

(4) Describe the impact of construction and operation on aquatic and terrestrial species and their habitats, including the possibility of a major alteration to ecosystems or biodiversity, and any potential impact on state-listed endangered or threatened species. Describe the impact of maintenance, clearing and treatment of the project area on fish, wildlife, and vegetation. Surveys may be required to determine specific areas of significant habitats or communities of species of special concern to state or local agencies.

(5) Identify all federally listed or proposed endangered or threatened species and critical habitat that potentially occur in the vicinity of the project. Discuss the results of the consultation requirements listed in § 380.13(b) at least through § 380.13(b)(5)(i) and include any written correspondence that resulted from the consultation. The initial application must include the results of any required surveys unless seasonal considerations make this impractical. If species surveys are impractical, there must be field surveys to determine the presence of suitable habitat unless the entire project area is suitable habitat.

(6) Identify all federally listed essential fish habitat (EFH) that potentially occurs in the vicinity of the project. Provide information on all EFH, as identified by the pertinent Federal fishery management plans, that may be adversely affected by the project and the results of abbreviated consultations with NMFS, and any resulting EFH assessments.

(7) Describe site-specific mitigation measures to minimize impacts on fisheries, wildlife, and vegetation.

(8) Include copies of correspondence not provided pursuant to paragraph (e)(5) of this section, containing recommendations from appropriate Federal and state fish and wildlife agencies to avoid or limit impact on wildlife, fisheries, and vegetation, and the applicant's response to the recommendations.

(f) Resource Report 4—Cultural resources. This report is required for all applications. In preparing this report, the applicant must follow the principles in § 380.14 of this part. Guidance on the content and the format for the documentation listed below, as well as professional qualifications of preparers, is detailed in "Office of Energy Projects' (OEP) Guidelines for Reporting on Cultural Resources Investigations," which is available from the Commission Internet home page or from the Commission staff.

(1) Resource Report 4 must contain:

(i) Documentation of the applicant's initial cultural resources consultation, including consultations with Native Americans and other interested persons (if appropriate);

(ii) Overview and Survey Reports, as appropriate;

**024**

USCA Case #23-1222    Document #2031422       Filed: 12/13/2023    Page 29 of 104

(iii) Evaluation Report, as appropriate;

(iv) Treatment Plan, as appropriate; and

(v) Written comments from State Historic Preservation Officer(s) (SHPO), Tribal Historic Preservation Officers (THPO), as appropriate, and applicable land-managing agencies on the reports in paragraphs (f)(1)(i)–(iv) of this section.

(2) Initial filing requirements. The initial application must include the documentation of initial cultural resource consultation, the Overview and Survey Reports, if required, and written comments from SHPOs, THPOs and land-managing agencies, if available. The initial cultural resources consultations should establish the need for surveys. If surveys are deemed necessary by the consultation with the SHPO/THPO, the survey report must be filed with the application.

(i) If the comments of the SHPOs, THPOs, or land-management agencies are not available at the time the application is filed, they may be filed separately, but they must be filed before a final certificate is issued.

(ii) If landowners deny access to private property and certain areas are not surveyed, the unsurveyed area must be identified by mileposts, and supplemental surveys or evaluations shall be conducted after access is granted. In such circumstances, reports, and treatment plans, if necessary, for those inaccessible lands may be filed after a certificate is issued.

(3) The Evaluation Report and Treatment Plan, if required, for the entire project must be filed before a final certificate is issued.

(i) The Evaluation Report may be combined in a single synthetic report with the Overview and Survey Reports if the SHPOs, THPOs, and land-management agencies allow and if it is available at the time the application is filed.

(ii) In preparing the Treatment Plan, the applicant must consult with the Commission staff, the SHPO, and any applicable THPO and land-management agencies.

(iii) Authorization to implement the Treatment Plan will occur only after the final certificate is issued.

(4) Applicant must request privileged treatment for all material filed with the Commission containing location, character, and ownership information about cultural resources in accordance with § 388.112 of this chapter. The cover and relevant pages or portions of the report should be clearly labeled in bold lettering: "CONTAINS PRIVILEGED INFORMATION—DO NOT RELEASE."

(5) Except as specified in a final Commission order, or by the Director of the Office of Energy Projects, construction may not begin until all cultural resource reports and plans have been approved.

**025**

(g) Resource Report 5—Socioeconomics. This report is required only for applications involving significant aboveground facilities, including, among others, conditioning or liquefied natural gas (LNG) plants. It must identify and quantify the impacts of constructing and operating the proposed project on factors affecting towns and counties in the vicinity of the project. Resource Report 5 must:

(1) Describe the socioeconomic impact area.

(2) Evaluate the impact of any substantial immigration of people on governmental facilities and services and plans to reduce the impact on the local infrastructure.

(3) Describe on-site manpower requirements and payroll during construction and operation, including the number of construction personnel who currently reside within the impact area, would commute daily to the site from outside the impact area, or would relocate temporarily within the impact area.

(4) Determine whether existing housing within the impact area is sufficient to meet the needs of the additional population.

(5) Describe the number and types of residences and businesses that would be displaced by the project, procedures to be used to acquire these properties, and types and amounts of relocation assistance payments.

(6) Conduct a fiscal impact analysis evaluating incremental local government expenditures in relation to incremental local government revenues that would result from construction of the project. Incremental expenditures include, but are not limited to, school operating costs, road maintenance and repair, public safety, and public utility costs.

(h) Resource Report 6—Geological resources. This report is required for applications involving LNG facilities and all other applications, except those involving only facilities within the boundaries of existing aboveground facilities, such as a compressor, meter, or regulator station. It must describe geological resources and hazards in the project area that might be directly or indirectly affected by the proposed action or that could place the proposed facilities at risk, the potential effects of those hazards on the facility, and methods proposed to reduce the effects or risks. Resource Report 6 must:

(1) Describe, by milepost, mineral resources that are currently or potentially exploitable;

(2) Describe, by milepost, existing and potential geological hazards and areas of nonroutine geotechnical concern, such as high seismicity areas, active faults, and areas susceptible to soil liquefaction; planned, active, and abandoned mines; karst terrain; and areas of potential ground failure, such as subsidence, slumping, and landsliding. Discuss the hazards posed to the facility from each one.

(3) Describe how the project would be located or designed to avoid or minimize adverse effects to the resources or risk to itself, including geotechnical investigations and monitoring that would be conducted before, during, and after construction. Discuss also the potential for blasting to affect structures, and the measures to be taken to remedy such effects.

**026**

(4) Specify methods to be used to prevent project-induced contamination from surface mines or from mine tailings along the right-of-way and whether the project would hinder mine reclamation or expansion efforts.

(5) If the application involves an LNG facility located in zones 2, 3, or 4 of the Uniform Building Code's Seismic Risk Map, or where there is potential for surface faulting or liquefaction, prepare a report on earthquake hazards and engineering in conformance with "Data Requirements for the Seismic Review of LNG Facilities," NBSIR 84–2833. This document may be obtained from the Commission staff.

(6) If the application is for underground storage facilities:

(i) Describe how the applicant would control and monitor the drilling activity of others within the field and buffer zone;

(ii) Describe how the applicant would monitor potential effects of the operation of adjacent storage or production facilities on the proposed facility, and vice versa;

(iii) Describe measures taken to locate and determine the condition of old wells within the field and buffer zone and how the applicant would reduce risk from failure of known and undiscovered wells; and

(iv) Identify and discuss safety and environmental safeguards required by state and Federal drilling regulations.

(i) Resource Report 7—Soils. This report is required for all applications except those not involving soil disturbance. It must describe the soils that would be affected by the proposed project, the effect on those soils, and measures proposed to minimize or avoid impact. Resource Report 7 must:

(1) List, by milepost, the soil associations that would be crossed and describe the erosion potential, fertility, and drainage characteristics of each association.

(2) If an aboveground facility site is greater than 5 acres:

(i) List the soil series within the property and the percentage of the property comprised of each series;

(ii) List the percentage of each series which would be permanently disturbed;

(iii) Describe the characteristics of each soil series; and

(iv) Indicate which are classified as prime or unique farmland by the U.S. Department of Agriculture, Natural Resources Conservation Service.

**027**

(3) Identify, by milepost, potential impact from: Soil erosion due to water, wind, or loss of vegetation; soil compaction and damage to soil structure resulting from movement of construction vehicles; wet soils and soils with poor drainage that are especially prone to structural damage; damage to drainage tile systems due to movement of construction vehicles and trenching activities; and interference with the operation of agricultural equipment due to the probability of large stones or blasted rock occurring on or near the surface as a result of construction.

(4) Identify, by milepost, cropland and residential areas where loss of soil fertility due to trenching and backfilling could occur.

(5) Describe proposed mitigation measures to reduce the potential for adverse impact to soils or agricultural productivity. Compare proposed mitigation measures with the staff's current "Upland Erosion Control, Revegetation and Maintenance Plan," which is available from the Commission Internet home page or from the Commission staff, and explain how proposed mitigation measures provide equivalent or greater protections to the environment.

(j) Resource Report 8—Land use, recreation and aesthetics. This report is required for all applications except those involving only facilities which are of comparable use at existing compressor, meter, and regulator stations. It must describe the existing uses of land on, and (where specified) within 0.25 mile of, the proposed project and changes to those land uses that would occur if the project is approved. The report shall discuss proposed mitigation measures, including protection and enhancement of existing land use. Resource Report 8 must:

(1) Describe the width and acreage requirements of all construction and permanent rights-of-way and the acreage required for each proposed plant and operational site, including injection or withdrawal wells.

(i) List, by milepost, locations where the proposed right-of-way would be adjacent to existing rights-of-way of any kind.

(ii) Identify, preferably by diagrams, existing rights-of-way that would be used for a portion of the construction or operational right-of-way, the overlap and how much additional width would be required.

(iii) Identify the total amount of land to be purchased or leased for each aboveground facility, the amount of land that would be disturbed for construction and operation of the facility, and the use of the remaining land not required for project operation.

(iv) Identify the size of typical staging areas and expanded work areas, such as those at railroad, road, and waterbody crossings, and the size and location of all pipe storage yards and access roads.

(2) Identify, by milepost, the existing use of lands crossed by the proposed pipeline, or on or adjacent to each proposed plant and operational site.

(3) Describe planned development on land crossed or within 0.25 mile of proposed facilities, the time frame (if available) for such development, and proposed coordination to minimize impacts on land use. Planned development means development which is included in a master plan or is on file with the local planning board or the county.

**028**

USCA Case #23-1222    Document #2031422    Filed: 12/13/2023    Page 33 of 104

(4) Identify, by milepost and length of crossing, the area of direct effect of each proposed facility and operational site on sugar maple stands, orchards and nurseries, landfills, operating mines, hazardous waste sites, state wild and scenic rivers, state or local designated trails, nature preserves, game management areas, remnant prairie, old-growth forest, national or state forests, parks, golf courses, designated natural, recreational or scenic areas, or registered natural landmarks, Native American religious sites and traditional cultural properties to the extent they are known to the public at large, and reservations, lands identified under the Special Area Management Plan of the Office of Coastal Zone Management, National Oceanic and Atmospheric Administration, and lands owned or controlled by Federal or state agencies or private preservation groups. Also identify if any of those areas are located within 0.25 mile of any proposed facility.

(5) Identify, by milepost, all residences and buildings within 50 feet of the proposed pipeline construction right-of-way and the distance of the residence or building from the right-of- way. Provide survey drawings or alignment sheets to illustrate the location of the facilities in relation to the buildings.

(6) Describe any areas crossed by or within 0.25 mile of the proposed pipeline or plant and operational sites which are included in, or are designated for study for inclusion in: The National Wild and Scenic Rivers System (16 U.S.C. 1271); The National Trails System (16 U.S.C. 1241); or a wilderness area designated under the Wilderness Act (16 U.S.C. 1132).

(7) For facilities within a designated coastal zone management area, provide a consistency determination or evidence that the applicant has requested a consistency determination from the state's coastal zone management program.

(8) Describe the impact the project will have on present uses of the affected area as identified above, including commercial uses, mineral resources, recreational areas, public health and safety, and the aesthetic value of the land and its features. Describe any temporary or permanent restrictions on land use resulting from the project.

(9) Describe mitigation measures intended for all special use areas identified under paragraphs (j)(2) through (6) of this section.

(10) Describe proposed typical mitigation measures for each residence that is within 50 feet of the edge of the pipeline construction right-of-way, as well as any proposed residence-specific mitigation. Describe how residential property, including for example, fences, driveways, stone walls, sidewalks, water supply, and septic systems, would be restored. Describe compensation plans for temporary and permanent rights-of-way and the eminent domain process for the affected areas.

(11) Describe measures proposed to mitigate the aesthetic impact of the facilities especially for aboveground facilities such as compressor or meter stations.

(12) Demonstrate that applications for rights-of-way or other proposed land use have been or soon will be filed with Federal land-management agencies with jurisdiction over land that would be affected by the project.

**029**

USCA Case #23-1222      Document #2031422      Filed: 12/13/2023      Page 34 of 104

(k) Resource Report 9—Air and noise quality. This report is required for applications involving compressor facilities at new or existing stations, and for all new LNG facilities. It must identify the effects of the project on the existing air quality and noise environment and describe proposed measures to mitigate the effects. Resource Report 9 must:

(1) Describe the existing air quality, including background levels of nitrogen dioxide and other criteria pollutants which may be emitted above EPA–identified significance levels.

(2) Quantitatively describe existing noise levels at noise-sensitive areas, such as schools, hospitals, or residences and include any areas covered by relevant state or local noise ordinances.

(i) Report existing noise levels as the $L_{eq}$ (day), $L_{eq}$ (night), and $L_{dn}$ and include the basis for the data or estimates.

(ii) For existing compressor stations, include the results of a sound level survey at the site property line and nearby noise-sensitive areas while the compressors are operated at full load.

(iii) For proposed new compressor station sites, measure or estimate the existing ambient sound environment based on current land uses and activities.

(iv) Include a plot plan that identifies the locations and duration of noise measurements, the time of day, weather conditions, wind speed and direction, engine load, and other noise sources present during each measurement.

(3) Estimate the impact of the project on air quality, including how existing regulatory standards would be met.

(i) Provide the emission rate of nitrogen oxides from existing and proposed facilities, expressed in pounds per hour and tons per year for maximum operating conditions, include supporting calculations, emission factors, fuel consumption rates, and annual hours of operation.

(ii) For major sources of air emissions (as defined by the Environmental Protection Agency), provide copies of applications for permits to construct (and operate, if applicable) or for applicability determinations under regulations for the prevention of significant air quality deterioration and subsequent determinations.

(4) Provide a quantitative estimate of the impact of the project on noise levels at noise-sensitive areas, such as schools, hospitals, or residences.

(i) Include step-by-step supporting calculations or identify the computer program used to model the noise levels, the input and raw output data and all assumptions made when running the model, far-field sound level data for maximum facility operation, and the source of the data.

(ii) Include sound pressure levels for unmuffled engine inlets and exhausts, engine casings, and cooling equipment; dynamic insertion loss for all mufflers; sound transmission loss for all compressor building components, including walls,

roof, doors, windows and ventilation openings; sound attenuation from the station to nearby noise-sensitive areas; the manufacturer's name, the model number, the performance rating; and a description of each noise source and noise control component to be employed at the proposed compressor station. For proposed compressors the initial filing must include at least the proposed horsepower, type of compression, and energy source for the compressor.

(iii) Far-field sound level data measured from similar units in service elsewhere, when available, may be substituted for manufacturer's far-field sound level data.

(iv) If specific noise control equipment has not been chosen, include a schedule for submitting the data prior to certification.

(v) The estimate must demonstrate that the project will comply with applicable noise regulations and show how the facility will meet the following requirements:

(A) The noise attributable to any new compressor station, compression added to an existing station, or any modification, upgrade or update of an existing station, must not exceed a day- night sound level ($L_{dn}$) of 55 dBA at any pre-existing noise-sensitive area (such as schools, hospitals, or residences).

(B) New compressor stations or modifications of existing stations shall not result in a perceptible increase in vibration at any noise-sensitive area.

(5) Describe measures and manufacturer's specifications for equipment proposed to mitigate impact to air and noise quality, including emission control systems, installation of filters, mufflers, or insulation of piping and buildings, and orientation of equipment away from noise-sensitive areas.

(l) Resource Report 10—Alternatives. This report is required for all applications. It must describe alternatives to the project and compare the environmental impacts of such alternatives to those of the proposal. The discussion must demonstrate how environmental benefits and costs were weighed against economic benefits and costs, and technological and procedural constraints. The potential for each alternative to meet project deadlines and the environmental consequences of each alternative shall be discussed. Resource Report 10 must:

(1) Discuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation. Provide an analysis of the relative environmental benefits and costs for each alternative.

(2) Describe alternative routes or locations considered for each facility during the initial screening for the project.

(i) For alternative routes considered in the initial screening for the project but eliminated, describe the environmental characteristics of each route or site, and the reasons for rejecting it. Identify the location of such alternatives on maps of sufficient scale to depict their location and relationship to the proposed action, and the relationship of the pipeline to existing rights-of-way.

**031**

(ii) For alternative routes or locations considered for more in-depth consideration, describe the environmental characteristics of each route or site and the reasons for rejecting it. Provide comparative tables showing the differences in environmental characteristics for the alternative and proposed action. The location of any alternatives in this paragraph shall be provided on maps equivalent to those required in paragraph (c)(2) of this section.

(m) Resource Report 11—Reliability and safety. This report is required for applications involving new or recommissioned LNG facilities. Information previously filed with the Commission need not be refiled if the applicant verifies its continued validity. This report shall address the potential hazard to the public from failure of facility components resulting from accidents or natural catastrophes, how these events would affect reliability, and what procedures and design features have been used to reduce potential hazards. Resource Report 11 must:

(1) Describe measures proposed to protect the public from failure of the proposed facilities (including coordination with local agencies).

(2) Discuss hazards, the environmental impact, and service interruptions which could reasonably ensue from failure of the proposed facilities.

(3) Discuss design and operational measures to avoid or reduce risk.

(4) Discuss contingency plans for maintaining service or reducing downtime.

(5) Describe measures used to exclude the public from hazardous areas. Discuss measures used to minimize problems arising from malfunctions and accidents (with estimates of probability of occurrence) and identify standard procedures for protecting services and public safety during maintenance and breakdowns.

(n) Resource Report 12—PCB contamination. This report is required for applications involving the replacement, abandonment by removal, or abandonment in place of pipeline facilities determined to have polychlorinated biphenyls (PCBs) in excess of 50 ppm in pipeline liquids. Resource Report 12 must:

(1) Provide a statement that activities would comply with an approved EPA disposal permit, with the dates of issuance and expiration specified, or with the requirements of the Toxic Substances Control Act.

(2) For compressor station modifications on sites that have been determined to have soils contaminated with PCBs, describe the status of remediation efforts completed to date.

(o) Resource Report 13—Engineering and design material. This report is required for construction of new liquefied natural gas (LNG) facilities, or the recommissioning of existing LNG facilities. If the recommissioned facility is existing and is not being replaced, relocated, or significantly altered, resubmittal of information already on file with the Commission is unnecessary. Resource Report 13 must:

**032**

(1) Provide a detailed plot plan showing the location of all major components to be installed, including compression, pretreatment, liquefaction, storage, transfer piping, vaporization, truck loading/unloading, vent stacks, pumps, and auxiliary or appurtenant service facilities.

(2) Provide a detailed layout of the fire protection system showing the location of fire water pumps, piping, hydrants, hose reels, dry chemical systems, high expansion foam systems, and auxiliary or appurtenant service facilities.

(3) Provide a layout of the hazard detection system showing the location of combustible-gas detectors, fire detectors, heat detectors, smoke or combustion product detectors, and low temperature detectors. Identify those detectors that activate automatic shutdowns and the equipment that would shut down. Include all safety provisions incorporated in the plant design, including automatic and manually activated emergency shutdown systems.

(4) Provide a detailed layout of the spill containment system showing the location of impoundments, sumps, subdikes, channels, and water removal systems.

(5) Provide manufacturer's specifications, drawings, and literature on the fail-safe shut-off valve for each loading area at a marine terminal (if applicable).

(6) Provide a detailed layout of the fuel gas system showing all taps with process components.

(7) Provide copies of company, engineering firm, or consultant studies of a conceptual nature that show the engineering planning or design approach to the construction of new facilities or plants.

(8) Provide engineering information on major process components related to the first six items above, which include (as applicable) function, capacity, type, manufacturer, drive system (horsepower, voltage), operating pressure, and temperature.

(9) Provide manuals and construction drawings for LNG storage tank(s).

(10) Provide up-to-date piping and instrumentation diagrams. Include a description of the instrumentation and control philosophy, type of instrumentation (pneumatic, electronic), use of computer technology, and control room display and operation. Also, provide an overall schematic diagram of the entire process flow system, including maps, materials, and energy balances.

(11) Provide engineering information on the plant's electrical power generation system, distribution system, emergency power system, uninterruptible power system, and battery backup system.

(12) Identify all codes and standards under which the plant (and marine terminal, if applicable) will be designed, and any special considerations or safety provisions that were applied to the design of plant components.

**033**

(13) Provide a list of all permits or approvals from local, state, Federal, or Native American groups or Indian agencies required prior to and during construction of the plant, and the status of each, including the date filed, the date issued, and any known obstacles to approval. Include a description of data records required for submission to such agencies and transcripts of any public hearings by such agencies. Also provide copies of any correspondence relating to the actions by all, or any, of these agencies regarding all required approvals.

(14) Identify how each applicable requirement will comply with 49 CFR part 193 and the National Fire Protection Association 59A LNG Standards. For new facilities, the siting requirements of 49 CFR part 193, subpart B, must be given special attention. If applicable, vapor dispersion calculations from LNG spills over water should also be presented to ensure compliance with the U.S. Coast Guard's LNG regulations in 33 CFR part 127.

(15) Provide seismic information specified in Data Requirements for the Seismic Review of LNG facilities (NBSIR 84–2833, available from FERC staff) for facilities that would be located in zone 2, 3, or 4 of the Uniform Building Code Seismic Map of the United States.

**Credits**
[Order 603, 64 FR 26611, May 14, 1999; Order 603–A, 64 FR 54537, Oct. 7, 1999; Order 609, 64 FR 57392, Oct. 25, 1999; Order 699, 72 FR 45328, Aug. 14, 2007; Order 756, 77 FR 4895, Feb. 1, 2012]

SOURCE: 52 FR 47910, Dec. 17, 1987; 53 FR 8177, March 14, 1988; 56 FR 23154, May 20, 1991; 56 FR 52397, Oct. 18, 1991; Order 603–A, 64 FR 54537, Oct. 7, 1999; Order 756, 77 FR 4894, Feb. 1, 2012, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4370h, 7101–7352; E.O. 12009, 3 CFR 1978 Comp., p. 142.

Current through Dec. 1, 2023, 88 FR 83869. Some sections may be more current. See credits for details.

---

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**034**

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

> Code of Federal Regulations
>    Title 40. Protection of Environment
>       Chapter V. Council on Environmental Quality
>          Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
>          Part 1501. NEPA and Agency Planning (Refs & Annos)

40 C.F.R. § 1501.9

§ 1501.9 Scoping.

Effective: September 14, 2020
Currentness

(a) Generally. Agencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent.

(b) Invite cooperating and participating agencies. As part of the scoping process, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action), unless there is a limited exception under § 1507.3(f)(1) of this chapter.

(c) Scoping outreach. As part of the scoping process the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(d) Notice of intent. As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the Federal Register, except as provided in § 1507.3(f)(3) of this chapter. An agency also may publish notice in accordance with § 1506.6 of this chapter. The notice shall include, as appropriate:

(1) The purpose and need for the proposed action;

(2) A preliminary description of the proposed action and alternatives the environmental impact statement will consider;

(3) A brief summary of expected impacts;

**035**

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for identification of potential alternatives, information, and analyses relevant to the proposed action (see § 1502.17 of this chapter); and

(8) Contact information for a person within the agency who can answer questions about the proposed action and the environmental impact statement.

(e) Determination of scope. As part of the scoping process, the lead agency shall determine the scope and the significant issues to be analyzed in depth in the environmental impact statement. To determine the scope of environmental impact statements, agencies shall consider:

(1) Actions (other than unconnected single actions) that may be connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions that may require environmental impact statements;

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

(f) Additional scoping responsibilities. As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study the issues that are not significant or have been covered by prior environmental review(s) (§ 1506.3 of this chapter), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

**036**

(3) Indicate any public environmental assessments and other environmental impact statements that are being or will be prepared and are related to but are not part of the scope of the impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the environmental impact statement, as provided in § 1502.24 of this chapter.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(g) Revisions. An agency shall revise the determinations made under paragraphs (b), (c), (e), and (f) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43359, July 16, 2020, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

Notes of Decisions (26)

Current through Dec. 1, 2023, 88 FR 83869. Some sections may be more current. See credits for details.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**037**

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
        Part 1501. NEPA and Agency Planning (Refs & Annos)

40 C.F.R. § 1501.12

§ 1501.12 Incorporation by reference.

Effective: September 14, 2020

Currentness

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. Agencies shall cite the incorporated material in the document and briefly describe its content. Agencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43359, July 16, 2020, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**038**

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter V. Council on Environmental Quality
>       Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
>         Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.1

§ 1502.1 Purpose of environmental impact statement.

Effective: September 14, 2020
Currentness

The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is a document that informs Federal agency decision making and the public.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (68)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

---

End of Document                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**039**

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

> Code of Federal Regulations
> Title 40. Protection of Environment
> Chapter V. Council on Environmental Quality
> Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
> Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.8

§ 1502.8 Writing.

Effective: September 14, 2020
Currentness

Agencies shall write environmental impact statements in plain language and may use appropriate graphics so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (18)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**040**

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter V. Council on Environmental Quality
>       Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
>         Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.9

§ 1502.9 Draft, final, and supplemental statements.

Effective: September 14, 2020

Currentness

(a) Generally. Except for proposals for legislation as provided in § 1506.8 of this chapter, agencies shall prepare environmental impact statements in two stages and, where necessary, supplement them, as provided in paragraph (d)(1) of this section.

(b) Draft environmental impact statements. Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1501.9 of this chapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA as interpreted in the regulations in this subchapter. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all major points of view on the environmental impacts of the alternatives including the proposed action.

(c) Final environmental impact statements. Final environmental impact statements shall address comments as required in part 1503 of this chapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) Supplemental environmental impact statements. Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

**041**

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (659)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**042**

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter V. Council on Environmental Quality
            Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
            Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.14

§ 1502.14 Alternatives including the proposed action.

Effective: September 14, 2020
Currentness

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

**043**

Notes of Decisions (1464)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter V. Council on Environmental Quality
>       Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
>         Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.16

§ 1502.16 Environmental consequences.

Effective: September 14, 2020

Currentness

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

**045**

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (1274)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

---

**End of Document**                                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**046**

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
        Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.21

§ 1502.21 Incomplete or unavailable information.

Effective: September 14, 2020

Currentness

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete but available information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

**047**

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (157)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**048**

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
        Part 1506. Other Requirements of NEPA (Refs & Annos)

40 C.F.R. § 1506.6

§ 1506.6 Public involvement.

Effective: September 14, 2020
Currentness

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3 of this chapter).

(b) Provide public notice of NEPA–related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions. When selecting appropriate methods for providing public notice, agencies shall consider the ability of affected persons and agencies to access electronic media.

(1) In all cases, the agency shall notify those who have requested notice on an individual action.

(2) In the case of an action with effects of national concern, notice shall include publication in the Federal Register. An agency may notify organizations that have requested regular notice.

(3) In the case of an action with effects primarily of local concern, the notice may include:

(i) Notice to State, Tribal, and local agencies that may be interested or affected by the proposed action.

(ii) Notice to interested or affected State, Tribal, and local governments.

(iii) Following the affected State or Tribe's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

**049**

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(x) Notice through electronic media (e.g., a project or agency website, email, or social media).

(c) Hold or sponsor public hearings, public meetings, or other opportunities for public involvement whenever appropriate or in accordance with statutory requirements applicable to the agency. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law. When selecting appropriate methods for public involvement, agencies shall consider the ability of affected entities to access electronic media.

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552).

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43370, July 16, 2020, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

Notes of Decisions (73)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**050**

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    2

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter V. Council on Environmental Quality
>       Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
>       Part 1506. Other Requirements of NEPA (Refs & Annos)

40 C.F.R. § 1506.11

§ 1506.11 Timing of agency action.

Effective: September 14, 2020
Currentness

(a) The Environmental Protection Agency shall publish a notice in the Federal Register each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section are calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies may not make or issue a record of decision under § 1505.2 of this chapter for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a proposed action in the following circumstances:

(1) Some agencies have a formally established appeal process after publication of the final environmental impact statement that allows other agencies or the public to take appeals on a decision and make their views known. In such cases where a real opportunity exists to alter the decision, the agency may make and record the decision at the same time it publishes the environmental impact statement. This means that the period for appeal of the decision and the 30–day period set forth in paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of appeal and provide notification consistent with § 1506.10; or

(2) An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule

**051**

simultaneously with publication of the notice of the availability of the final environmental impact statement, and provide notification consistent with § 1506.10, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the decision-making period and the 90–day period may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.10. Upon a showing by the lead agency of compelling reasons of national policy, the Environmental Protection Agency may reduce the minimum periods and, upon a showing by any other Federal agency of compelling reasons of national policy, also may extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements. (§ 1507.3(f)(2) of this chapter) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43370, July 16, 2020, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

Notes of Decisions (14)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**052**

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
        Part 1508. Definitions (Refs & Annos)

40 C.F.R. § 1508.1

§ 1508.1 Definitions.

Effective: May 20, 2022
Currentness

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) Act or NEPA means the National Environmental Policy Act, as amended (42 U.S.C. 4321, et seq.).

(b) Affecting means will or may have an effect on.

(c) Authorization means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(d) Categorical exclusion means a category of actions that the agency has determined, in its agency NEPA procedures (§ 1507.3 of this chapter), normally do not have a significant effect on the human environment.

(e) Cooperating agency means any Federal agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action that may significantly affect the quality of the human environment.

(f) Council means the Council on Environmental Quality established by title II of the Act.

(g) Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

**053**

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

(h) Environmental assessment means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.

(i) Environmental document means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

(j) Environmental impact statement means a detailed written statement as required by section 102(2)(C) of NEPA.

(k) Federal agency means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(l) Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise categorically excluded (§ 1501.4 of this chapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(m) Human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (See also the definition of "effects" in paragraph (g) of this section.)

(n) Jurisdiction by law means agency authority to approve, veto, or finance all or part of the proposal.

(o) Lead agency means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the environmental impact statement.

**054**

(p) Legislation means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(q) Major Federal action or action means an activity or decision subject to Federal control and responsibility subject to the following:

(1) Major Federal action does not include the following activities or decisions:

(i) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

(ii) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority;

(iii) Activities or decisions that do not result in final agency action under the Administrative Procedure Act or other statute that also includes a finality requirement;

(iv) Judicial or administrative civil or criminal enforcement actions;

(v) Funding assistance solely in the form of general revenue sharing funds with no Federal agency control over the subsequent use of such funds;

(vi) Non–Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project; and

(vii) Loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance (for example, action does not include farm ownership and operating loan guarantees by the Farm Service Agency pursuant to 7 U.S.C. 1925 and 1941 through 1949 and business loan guarantees by the Small Business Administration pursuant to 15 U.S.C. 636(a), 636(m), and 695 through 697g).

(2) Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8 of this chapter).

(3) Major Federal actions tend to fall within one of the following categories:

(i) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 et seq. or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

**055**

(ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

(r) Matter includes for purposes of part 1504 of this chapter:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(s) Mitigation means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(t) NEPA process means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(u) Notice of intent means a public notice that an agency will prepare and consider an environmental impact statement.

(v) Page means 500 words and does not include explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

**056**

(w) Participating agency means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(x) Proposal means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(y) Publish and publication mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this chapter.

(z) Reasonable alternatives means a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action.

(aa) Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(bb) Referring agency means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(cc) Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§ 1501.11 of this chapter).

(dd) Senior agency official means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

(ee) Special expertise means statutory responsibility, agency mission, or related program experience.

(ff) Tiering refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

**Credits**
[85 FR 43378, July 16, 2020, as amended at 87 FR 23469, Apr. 20, 2022]

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43374, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

**057**

Notes of Decisions (2)

Current through Dec. 4, 2023, 88 FR 84232. Some sections may be more current. See credits for details.

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**058**

**DECLARATION OF EMMA GUEVARA**

I, Emma Guevara, declare as follows:

1.    My name is Emma Guevara. I am of legal age and competent to give this declaration. All the information in this declaration is based on my personal experience and my review of publicly available information. I give this declaration for use in Sierra Club's challenges to FERC's Remand Orders concerning the Rio Grande LNG, Rio Bravo, and Texas LNG projects.

2.    My primary residence is 544 Parkland Dr. Brownsville, TX, 78520. I have lived at my current address for 23 years. I have no plans to move at this time.

3.    I work as a Field Organizer for Sierra Club's Beyond Dirty Fuels Campaign in Brownsville, Texas. I have held this position for about two years. I applied to this position with the Sierra Club because my values and activism aligned with the organization's work. In my capacity as a Field Organizer, I fight oil and gas export projects in the Brownsville area as well as other environmentally damaging projects. For example, I fight Texas LNG, Rio Grande LNG, SpaceX, and all associated pipelines. I also coordinate press work to help maintain a public narrative that is informed by directly impacted community members.

4.    The Sierra Club is the nation's oldest grassroots organization and a nationwide non-profit environmental membership organization dedicated to the protection and preservation of the environment. Sierra Club has over 700,000 members nationwide, and is dedicated to exploring, enjoying, and protecting the wild places of the earth. Sierra Club also promotes the responsible use of the earth's ecosystems and resources, the education of communities, and the use of all lawful means to carry out these objectives.

**059**

5.    Sierra Club's membership includes persons who live or recreate near the Texas LNG, Rio Grande LNG, and Rio Bravo projects, and throughout the Texas Gulf Coast region. Its membership includes persons subject to the adverse impacts associated with the construction and operation of these projects.

6.    The Sierra Club's Dirty Fuels Campaign is dedicated to averting the worst impacts of the climate crisis through stopping the expansion of fossil fuel production and infrastructure and protecting the environment and communities from environmental impacts of these projects. Part of this program involves opposing the construction and operation of new oil and gas export terminals and associated infrastructure, including pipelines. We have staff who work on these issues and we work with Sierra Club members and volunteers to organize rallies, disseminate information, attend public meetings, submit comment to state and federal permitting agencies and more. The Sierra Club, as part of its Dirty Fuels Campaign, also brings lawsuits concerning oil and gas export terminals where appropriate.

7.    Construction and operation of the Rio Grande LNG and Texas LNG export terminals as well as the Rio Bravo pipeline will impede my work and the work of Sierra Club's Beyond Dirty Fuels Campaign because it will adversely impact air quality and water quality and will increase traffic. My work for Sierra Club often requires me to attend meetings and work-related events in Port Isabel (about twice per month, with no plans of ceasing), which requires me to commute on highway 48. Highway 48 travels directly in front of both Rio Grande LNG and Texas LNG. I'm concerned the construction and operation of these facilities will expose me to large amounts of air pollution because I regularly commute on highway 48 and pass directly in front of them. Additionally, many

**060**

of Sierra Club's members live and recreate near the proposed LNG terminals and pipeline route. And environmental harms caused by FERC's approval of these projects detracts from Sierra Club's efforts to protect these communities, our members, and the public. As noted, Sierra Club seeks to protect and preserve the environment. My understanding is that the construction and operation of the terminals and pipeline will result in the destruction of wetlands and emissions of large amounts of air pollution among other impacts to the environment.

8.      The construction and operation of the Rio Grande LNG and Texas LNG export terminals as well as the Rio Bravo pipeline will also adversely affect me personally as I live approximately 7 miles from the facilities. I suffer from asthma and the construction and operation of these LNG export terminals, which will release additional volatile organic compounds, nitrogen oxides, particulate matter, and various other pollutants into the air will exacerbate my symptoms and make it difficult for me to enjoy being outdoors. I enjoy being outside and often sit outside in my backyard or front porch. If the facilities are built I will likely spend less time outdoors because the air pollution will exacerbate my asthma symptoms, which include shortness of breath, coughing, and wheezing. However, if the facilities are not constructed or placed into operation, I will continue to enjoy my time outdoors at the same frequency as I currently do.

9.      I enjoy going to the beach and occasionally swimming at South Padre Island. I usually go about 2-3 times a month about six months out of the year. In order to get to South Padre Island, I have to drive on highway 48 which passes directly in front of both Rio Grande LNG and Texas LNG. I also shop at the HEB grocery store in Port Isabel a few times a year and I like to visit several restaurants in the area such as, Pirate's Landing,

**061**

Pelican Station, Whattaburger, and Starbucks about two times a month. These stores and restaurants are within about 3 miles of both LNG export terminals. I plan to continue visiting South Padre Island and the various shops and restaurants in Port Isabel, however, if the LNG terminals are constructed I will likely go less often as a result of my asthma and the impacts to the aesthetics of the area.

10.    I also enjoy bird watching about 2-3 times a year at the Laguna Atascosa Wildlife Refuge and plan to continue bird watching at that frequency. The Laguna Atascosa Wildlife Refuge is located across the street from Rio Grande LNG. If the construction of the export terminals continues and these facilities ultimately become operational, I believe there will be less birds to watch as a result of the loud noises and flaring from the facilities. Moreover, the construction of the facilities would ruin my ability to enjoy the refuge as I would clearly be able to see Rio Grande LNG from where I bird watch and will likely be able to see Texas LNG as well. I would certainly visit the refuge less often, if at all, as a result of the reduced aesthetic and visual quality, and my concerns about the pollution's impact on my health.

11.    Outside of my work with Sierra Club, I am also a member of the South Texas Environmental Justice Network. The South Texas Environmental Justice Network is a network of directly impacted people of color working toward environmental justice in South Texas. As a member of the South Texas Environmental Justice Network I assist them in organizing around environmental justice issues in South Texas. Additionally, I assist this organization with its community education – weekly Zoom meetings, in addition to monthly community meetings in Brownsville and Port Isabel - and its press, mainly via Social Media posts, and occasional interviews with local news outlets.

**062**

12.    I am concerned about how these LNG facilities and associated pipelines will worsen the impacts of climate change as it is my understanding that Texas LNG and Rio Grande LNG will be the largest polluters in the Rio Grande Valley. I am also concerned about the safety risks associated with these facilities, particularly the risk of explosions. Lastly, I am concerned with the adverse effects this will have on the cultural preservation of the Carrizo/Comecrudo Tribe of Texas, as construction and operation of these facilities will infringe on sacred sites and will result in the loss of historical artifacts.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed 12/04, 2023.


_Emma Guevara_
Emma Gueverra

**063**

## <u>DECLARATION OF REBEKAH LYNN HINOJOSA</u>

I, Rebekah Lynn Hinojosa, hereby state as follows:

1.     I am of legal age and am competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated. I give this declaration for use in Sierra Club's challenges to FERC's Remand Orders concerning the Rio Grande LNG, Rio Bravo pipeline, and Texas LNG projects.

2.     I currently reside in Brownsville, Texas, about 39 minutes from the Laguna Atascosa Wildlife Refuge. I have lived at my current address for over four years, and I have lived in Brownsville for over five years. I have lived in cities throughout the broader Rio Grande Valley region for over 26 years. I have no plans to leave.

3.     I have been a member of the Sierra Club for about seven-and-a-half years. While I was at university, I was a part of the Sierra Student Coalition. Soon after I graduated I began working for Sierra Club and I continued to work there for over seven years. While I no longer work at the Sierra Club, I remain an active member. Moreover, despite changing jobs, I continue to organize and work with community campaigns to support wildlife and conservation issues. Specifically, I

1

**064**

work to educate the public on liquefied natural gas ("LNG")
infrastructure that would endanger the health of my community, the
integrity of the local ecosystem, and the climate.

4.    The Sierra Club is a nationwide non-profit environmental
membership organization whose purpose is to explore, enjoy, and
protect the wild places of the earth; to practice and promote the
responsible use of the earth's ecosystem and resources; to educate and
enlist humanity to protect and restore the quality of the natural and
human environment; and to use all lawful means to carry out those
objectives. Restoring the quality of the natural and human environment
includes protecting the biological integrity of the land, quality of the air,
and the protection of threatened and endangered species such as the
ocelot and their habitat.

5.    I both recreate and work in the Bahia Grande unit of the Laguna
Atascosa National Wildlife Refuge. I visit the area about once every two
months and plan to visit at this rate indefinitely into the future. The
area I visit is right on Highway 48, adjacent to the Rio Grande LNG
and Texas LNG terminal facilities. I recreate in the Bahia Grande by
taking walks and taking in the view of the wetlands. I enjoy watching

2

**065**

the wildlife, especially migratory birds like the spoonbill, brown pelican, blue heron, and endangered Aplomado falcon. I often look for ocelots, a species I admire.

6.     I am very concerned about impacts from construction and operation of the Rio Grande LNG and Texas LNG when I am recreating in the Bahia Grande. It is my understanding that construction and operation of these facilities will emit a lot of air pollution. I am concerned about how this air pollution will impact my health when I am at the Bahia Grande. I am also concerned about negative impacts from air pollution more generally. I live in the project area. It is my understanding that these projects will make the air quality in my community worse. I am concerned about the impacts this will have on my health. While I am concerned about all the air pollution from the projects, both individually and cumulatively, I am especially concerned with emissions of particulate matter and nitrogen oxides. It is my understanding that these kinds of air pollution can have negative impacts on my respiratory health.

7.     I have other concerns about these projects too. One of the reasons I go to the Bahia Grande to recreate is to enjoy the natural beauty of

**066**

the area. Construction of the Rio Grande LNG and Texas LNG facilities will substantially reduce my enjoyment of the natural beauty of the Bahia Grande area. In fact, it already has. I have gone to the Bahia Grande several times since Rio Grande LNG began site preparation activities. Each time, my attempts to enjoy my natural surroundings were thwarted. If site preparation activities were to continue, my inability to enjoy the Bahia Grande would continue. If Rio Grande LNG began construction and/or if Texas LNG began construction and/or site preparation activities, this issue would be worse. If either or both facilities were eventually placed into service, this too would make it impossible for me to enjoy my time at the Bahia Grande like I was able to before FERC approved these facilities.

8.     I am also concerned about impacts from the Rio Bravo pipeline system. I am familiar with the project and with the proposed route of the pipeline system. And I know the Rio Bravo Pipeline would cross the Bahia Grande where I go when I am there. I have many concerns about the pipeline system. Construction of the pipeline would require clearing trees and brush along the entire route, and the center of the right of way would be kept clear permanently, leaving a scar on the land that

**067**

would ruin the view of the wetlands that I enjoy so much. I also worry that the clearing of the area's vegetation, the construction of the pipeline, and the noise of the pipeline's construction would devastate the integrity of the habitat and threaten the wildlife I admire, including the ocelot and migratory birds. The loss of vegetation would damage the wetlands that birds like spoonbills, brown pelicans, and blue herons depend on to live. Preserving the habitat and wildlife of the Bahia Grande is extremely important because it is where the ocelot and these birds live and travel. If the Rio Bravo Pipeline is built, it will have adverse impacts on these populations. So would the Rio Grande LNG and Texas LNG projects. This would be very upsetting because it would limit opportunities for me and the rest of the general public to see them, all while creating an eyesore of once pristine wetland. If built, construction and operation of the Rio Bravo Pipeline would substantially reduce my enjoyment of recreating at the Bahia Grande.

9.    I am especially concerned about the impacts of all three projects on the ocelot. The Rio Grande Valley is home to the ocelot; they are vital for my community's ecosystem, food chain, and culture and roam through the beautiful Laguna Atascosa National Wildlife Refuge. All

**068**

over the valley we have ocelot themed gatherings, educational events, 5k runs, wildlife events, and more. It is a deeply significant species to the people that live in this valley. We learn about ocelots in public school. We visit nature parks that are part of the wildlife corridor in the region where the ocelot traverse. It is a very big part of my life. Ocelots are so endangered that we don't actively see them outside of community events. It would mean so much to me to see one in the wild in my lifetime. For now, I enjoy seeing photos online of ocelots from wildlife cameras located in our community. It is very upsetting to me that these three projects, both individually and cumulatively, would destroy habitat that the few remaining ocelots use for survival. And it is very upsetting to me that construction of the projects, both individually and cumulatively, would lead to more traffic that would lead to vehicles striking ocelots.

10.    I am also concerned about the safety of the Rio Bravo pipeline system. Texas has a horrible track record for pipeline safety, and so I fear my community would be at risk of pipeline explosions. There have been several pipeline explosions in Texas. Texas has more miles of pipelines than roads, and the Texas Railroad Commission, which

**069**

oversees pipelines, is severely understaffed and has a track record of failing to oversee pipelines and respond to pipeline disasters. Given that track record, I'm worried about what will happen if the massive Rio Bravo pipeline system, carrying so much gas through the community, explodes or leaks—it would be devastating for the community. Two pipelines, side-by-side, with that much gas would have a massive blast radius, over a thousand feet, or maybe even half-a-mile. I'm worried about what that means for local families, wildlife, wetlands, water, and roads. Texas has a terrible track record of cleaning up and addressing explosions. For example, in Los Fresnos there is an existing Enbridge pipeline that caused a sinkhole to appear in the community. In east Texas, Enbridge, which would build the Rio Bravo pipeline, didn't properly mark where the pipeline was. A man mowed the grass over the pipeline, it exploded, and he died. I don't trust Enbridge to build a pipeline in my community.

11.    Part of my job is educating my local community, visitors, and elected officials and introducing them to the beauty of the Bahia Grande. I give tours of the Bahia Grande to reporters, journalists, filmmakers, and community leaders to show them the ecosystem and

**070**

encourage them to help preserve it. The Bahia Grande is special because it's very accessible—you can just pull over on the highway and enjoy its beauty. Other wildlife refuges and nature centers nearby are more difficult to get to and are not as vast. I educate the community about their impacts on the surrounding ecosystem and how the ecosystem impacts them. I also organize petitions, letters, and protests within my community to urge local officials and banks to drop support for oil and gas projects and to protect our community, the ecosystem, and the planet.

12.    If construction and/or operation of the Rio Grande LNG terminal, Texas LNG terminal, and/or Rio Bravo pipeline begins, it would make visits to the Bahia Grande more difficult. Construction would take over Highway 48 and make the Bahia Grande more difficult to access. I've seen this happen to the Bahia Grande when other nearby pipelines were built. And it has already started happening with site preparation activities at the Rio Grande LNG terminal. The scar on the landscape from the projects would negatively impact my enjoyment and the enjoyment of people I tour around the Bahia Grande. For these reasons, it would be harder for me to enlist their support in protecting our

**071**

community, ecosystem, and planet. It would increase exports of liquefied natural gas sources from the Permian Basin and Eagle Ford shale and intensify fracking around communities I work with, even though they are already overburdened with the consequences of fossil fuel development. The increased use of liquefied natural gas would continue to worsen climate change. If this pipeline is built, my work would be made more difficult.

13.    I am an environmentalist in this region. I have dedicated my entire professional career to trying to preserve the natural habitat in the area that I call home. The ocelot is already so critically endangered that scientists have said they faced a high risk of extinction in the next 40 years. It grieves me that my generation may be the last to visit their wildlife habitats, see evidence of their existence, and get a glimpse of them—something I glean so much personal enjoyment from. I worry for the populations of wild bird species I watch and lament that the projects would destroy their habitat. The destruction of habitat for the construction of the projects would negatively impact my enjoyment of the Bahia Grande. I worry it will detract from the enjoyment of people I tour around the Bahia Grande, making my job to educate and persuade

072

them more difficult. For these personal and professional reasons, these projects would negatively impact my life. I support the Sierra Club's litigation and hope the Sierra Club succeeds.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Dated __November 27_____, 2023

_Rebekah Hinojosa_

Rebekah Lynn Hinojosa

**073**

## DECLARATION OF JARED HOCKEMA

I, Jared Hockema, hereby state as follows:

1.    I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated. I give this declaration for the City of Port Isabel's challenges to FERC's Remand Orders concerning the Rio Grande LNG, Rio Bravo, and Texas LNG projects.

2.    I am the City Manager of the City of Port Isabel ("City"). As the City Manager, I administer the City, oversee the City, hire and fire City employees, set the budget, enforce the budget, oversee the departments, enforce ordinances, and carry out the directives of the City Commission. I have served as the City Manager since May 2015.

3.    Port Isabel is a coastal City located in Cameron, County, Texas with a population of 5,108 as of July 1, 2022. Port Isabel is a historic sea port and fishing community that has transitioned to a tourism-based economy as the local fishing industry has declined. More than three-quarters (82%) of City residents are Hispanic. City residents have a per capita income of $19,190 and 27.7% live in poverty.

**074**

4.     Port Isabel expends approximately $7.5 million annually on the maintenance and management of City lands, historic districts, historic sites, nature centers, streets, parking lots, sidewalks, marinas, libraries, meeting halls, and other public facilities and the provision of public services including fire, police, shuttle bus transportation, trash collection, parking and enforcement of land use plans and zoning regulations.

5.     The Rio Grande LNG terminal site is located adjacent to City land and approximately 1.66 miles from the populated parts of the City. Additionally, the Rio Bravo pipeline, which will serve the terminal, runs along or within City limits. Rio Grande LNG is the larger of the two terminals proposed along the Brownsville Ship Channel.

6.     The Texas LNG terminal site is located adjacent to City land and approximately 0.8 miles from the populated parts of the City.

7.     The adverse environmental impacts of these projects, both individually and collectively, will harm the economic, aesthetic, public safety, and natural resource interests of the City.

8.     The increased traffic, closure of the ship channel for LNG vessel traffic, air pollution, visual impacts, and noise from the construction

**075**

and operation of these projects will degrade the City's quiet, beauty, serenity, and natural character. This damage to the character and perception of the City will likely erode tax revenue for the City due to a decrease in tourism, recreational and commercial fishing businesses, and property taxes. These impacts have already begun, as heavy truck traffic, frequent road blockages and the reduction to one lane along SH 48 from site preparation activities for the Rio Grande LNG project have severely limited access to the City of Port Isabel.

9.     The economic interests of the City will also be harmed by the risk of explosions and emergencies from the projects, which would require the City to expend additional public safety resources to ensure the safety of its residents. The Cameron County Space Port/Space X Launch Facility is located approximately 6.8 miles from the terminal sites. Recent explosions at the Space X facility sent shockwaves through the City, highlighting the danger posed by the close proximity of the terminal sites to the launch facility, as well as the potential for the projects to adversely affect the City.

10.     The City is greatly concerned about the location of the proposed projects in an area of special scenic, cultural and historic value. The

**076**

projects are located adjacent to the Bahia Grande Unit of the Laguna Atascosa National Wildlife Refuge. This highly sensitive site is notable for the habitat it provides to threatened and endangered species, such as the ocelot and the jaguarundi; its importance in fostering economically important recreational and commercial fishing activities for the City and its residents; and for the presence of Native American artifacts. Additionally, numerous other sites of special scenic, cultural, and historic value are located in the City and its surrounding area. These include the Port Isabel Lighthouse, numerous parks, and the Laguna Madre.

11.    As a result, the projects would adversely impact environmentally sensitive ecosystems and natural resources within City limits. The Bahia Grande Unit of the refuge is located within the City's limits and directly abuts the proposed sites. This area provides habitat for endangered species and sensitive natural resources. Given the proximity of this refuge to the proposed projects, the additional air pollution, traffic, and noise, along with the destruction of wetlands, and other harmful environmental impacts would have an adverse impact on the use of this important City natural resource.

**077**

12.    These impacts are already occurring due to site preparation activities at the Rio Grande LNG site. Ancient lomas have been destroyed. Areas within tidally-influenced lands and wetlands have been disturbed. Stormwater runoff laden with soil and construction debris has entered bodies of water. Large quantities of debris and sand now litter the site and the adjacent roadway. Additionally, the bright lights and heavy machinery are operated day and night. Numerous animals apparently fleeing the construction activity have been struck on the roadway. Unfortunately, the City has received at least one report that an ocelot was found dead near the construction site.

13.    The City invested significant resources into improvements to the Bahia Grande lagoon system and its citizens and visitors regularly fish and kayak in these lagoons. There are several channels that interconnect these lagoons in order to enhance this sensitive environmental area. The City helped construct these channels. Therefore, harm to these natural resources would severely undermine this important work and also have an adverse economic impact on the City.

**078**

14.    The City's residents and employees will also be harmed by exposure to higher levels of air pollution, including ozone levels that could violate federal air quality standards caused by the projects. In particular, the Laguna Madre Park and the Laguna Madre Youth Center are located within the City's limits. These popular facilities offer outdoor exercise and sports activities to the City's residents. The outdoor nature of these strenuous activities places the participants, as well as City staff, volunteers and spectators, at greater risk of harm from air pollution. Additionally, the Port Isabel Police Department Shooting Range is extremely close to the sites. The Rio Grande LNG site, for example, is less than one mile away. City employees and police officers spend significant time outdoors at this facility for various activities, such as target practice and fitness training. Again, the outdoor nature of these strenuous activities places the participants at greater risk of harm due to the air pollutants the projects will emit. The Port Isabel animal shelter is also located within City limits and is close to the facilities. It houses animals both outdoors and indoors. City employees and volunteers are placed at a greater risk of harm at the animal shelter due to the air pollutants the projects will emit. Finally,

**079**

the Artisan Apartment and Port Isabel Housing Authority are located in the City's limits and are owned by the Port Isabel Housing Authority. In addition to low-income persons, these buildings also house the elderly and disabled, who may be immunocompromised and, therefore, at a greater risk of harm from air pollution. This presents a potential environmental justice issue.

15.    The harmful health impacts from this increased air pollution would cause additional economic harm to the City from the need to expend more resources on health care for residents and employees. Many Port Isabel residents are uninsured, and medical conditions, including asthma, diabetes, and obesity are more prevalent in the City than in the state and nation.

16.    The City will also be harmed by the dust generated from site preparation, construction, and maintenance activities at the Rio Grande and Texas LNG terminal sites due to the location of the projects upwind of the City. Such dust has the potential to harm the health of City residents and damage public and private property. For many years following previous development activity near the project sites, the City was plagued by windborne dust. This dust, which was comprised of fine

**080**

silt and salt deposits, lead to increased respiratory illness among residents; diminished the attractiveness of the area to visitors; damaged public and private property due to its corrosive properties; and posed a hazard to drivers. The City worked for many years to abate the dust problem by restoring the Bahia Grande, and the proposed projects threaten to undo these efforts and cause the dust problems to return. As explained above, site preparation activities at the Rio Grande LNG site have already caused large amounts of loose soil and dust to be spread across the adjacent roadway and stormwater laden with soil to enter natural bodies of water and wetlands.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Dated this ____ day of November, 2023

_____

Jared Hockema
City of Port Isabel City Manager

**081**

# DECLARATION OF JUAN MANCIAS

I, Juan Mancias, hereby state the following:

1. I am of legal age and competent to give this declaration. All the information in this declaration is based on my own personal knowledge unless otherwise indicated. I am providing this declaration for the Carrizo Comecrudo Tribe of Texas' and Sierra Club's legal challenges to the proposed Rio Grande LNG and Texas LNG export terminals, and the Rio Bravo pipeline.

2. I am 69 years old and live in my home in Floresville, Texas. I am the Tribal Chair of the Carrizo Comecrudo Tribe of Texas and have been since 1981. In addition to being the Tribal Chair, I am also a member of the Carrizo Comecrudo Tribe of Texas.

3. The Carrizo Comecrudo Tribe of Texas is a non-profit organization dedicated to maintaining, preserving, and protecting the tribal identity of the Carrizo Comecrudo Tribe of Texas, in addition to other purposes. The Carrizo Comecrudo Tribe of Texas recently purchased land in Brownsville, Texas, approximately 4.8 miles from the Texas LNG export terminal, 4.6 miles from the Rio Grande LNG export terminal, and within a half-mile of the Rio Bravo pipeline system route. The Carrizo Comecrudo Tribe of Texas ia developing this property to be a spiritual center. As a result, I am in Brownsville and Port Isabel, Texas at least once a week and plan to continue being in Brownsville and Port Isabel, Texas at least once a week indefinitely into the future. The Carrizo Comecrudo Tribe of Texas also preserves and protects its tribal identity through the protection of sacred and culturally significant lands.

4. I am a member of the Sierra Club and have been since July 7, 2023. I joined the Sierra Club because I am concerned about the industrial development of my community and the impact

**082**

that this industrial development will have on the environment. And I wanted to join Sierra Club's efforts to fight against these harms to the environment.

5. I am familiar with the location of the Rio Grande LNG and Texas LNG export terminals and the route and location of the Rio Bravo pipeline system. As the Tribal Chair of the Carrizo Comecrudo Tribe of Texas, I am also familiar with the location of sites that are sacred to the Carrizo Comecrudo Tribe of Texas. Construction, and operation, of the Rio Grande LNG and Texas LNG export terminals and the Rio Bravo pipeline system will have serious adverse impacts on such sites. One of our most sacred sites is called Garcia Pasture. For centuries, it was where our people would seasonally gather to fish. Garcia Pasture is of such importance to the Carrizo Comecrudo Tribe of Texas that at least one member of our tribe is responsible for the site at all times. Right now, that is my responsibility. Previously, it was my father's responsibility. The Rio Grande LNG and Texas LNG export terminals each incur approximately 1,000 feet into Garcia Pasture from opposite sides, a significant violation of this sacred site. In addition to the physical incursion, construction and operation of both LNG export terminals would also block our access to the site, and as a result, our ability to worship at the site. And, finally, construction and operation of the Rio Grande LNG and Texas LNG export terminals would cause industrial noise, air pollution, industrial light, and other adverse impacts. These exigencies are completely incompatible with our use of Garcia Pasture.

6. The Rio Grande LNG and Texas LNG export terminals and the Rio Bravo pipeline system will have serious adverse impacts on other sacred sites as well. There are countless sacred burial sites in and around Brownsville, Texas. Some are within the footprints of the Rio Grande LNG and Texas LNG export facilities. I am concerned that construction of the

**083**

LNG export facilities will disturb these sacred sites. I am also concerned that construction and operation of the LNG export facilities will block our Tribe's access to these sacred sites. Additionally, the Rio Bravo pipeline system passes through several known burial sites that are sacred to the Carrizo Comecrudo Tribe of Texas. I am concerned that construction of the pipeline system will disturb these sites. And I am concerned that construction and operation of the pipeline system will block our Tribe's access to these sites.

7. Construction of the Rio Bravo pipeline system will have adverse impacts on our ability to use the land we purchased to develop a spiritual center. As noted, that land is within approximately 0.5 miles of the Rio Bravo pipeline system route. Based on my understanding of the location of the Rio Bravo pipeline system construction footprint and the location of access roads to the land, construction of the Rio Bravo pipeline will seriously limit my, and other tribal members', access to the land. This would undermine our ability to continue developing the property as a spiritual center.

8. It is my understanding that the construction and operation of the Rio Grande LNG and Texas LNG export facilities will emit serious amounts of air pollution. As noted, I am in Brownsville and Port Isabel at least once per week, sometimes more. It is my understanding that these air pollution emissions will reduce the air quality in Brownsville and Port Isabel. I am concerned about the impact that this reduction in air quality will have on my health. I am especially concerned because I already experience respiratory symptoms like coughing and wheezing and sometimes I struggle to breathe. As a result, I always have a supplemental oxygen system with me to help me breathe. I notice my respiratory symptoms are worse when the air quality where I am is worse. Air pollution really bothers my

**084**

respiratory system and makes it really hard for me to breathe. Thus, I am very concerned that emissions of air pollution from construction and operation of the Rio Grande LNG and Texas LNG export facilities will seriously impact my health and wellbeing.

9. Every time I am in Brownsville and Port Isabel, I engage in outdoor recreation. I plan to continue recreating at this rate indefinitely into the future. Approximately two-three times per month I use the recently purchased tribal land to go birding. I enjoy viewing many different species of birds when I bird, but I am especially fond of viewing the Aplomado Falcon. When I go birding I am struck by the connectedness of all life. It is my understanding that construction and operation of the Rio Bravo pipeline system and Rio Grande LNG and Texas LNG export facilities will destroy habitat for the Aplomado Falcon and other species of birds. Because the tribal land is so close to both the Rio Bravo pipeline system and the LNG export facilities, I am concerned that the destruction of Aplomado Falcon and other bird habitat will reduce the amount of birds available for me to view. I also enjoy going fishing in the area around the Rio Grande LNG and Texas LNG export facility. Specifically, at the Bahia Grande. I do this about two-to-three times per month and I plan to continue fishing here at this rate indefinitely into the future. I catch all kinds of fish, but I am especially fond of catching redfish, which is also called red drum. Sometimes I catch and release the fish and sometimes I eat the fish that I catch. It is my understanding that construction and operation of the Rio Bravo pipeline system and Rio Grande LNG and Texas LNG export facilities will destroy wetlands that are crucial habitat for red fish and other fish that I catch. I am concerned that destruction of these wetlands will reduce the amount of fish that I can catch.

**085**

10.  Another of my favorite recreational activities is to simply go outside and enjoy nature. I do this every time I am in Brownsville and Port Isabel. I frequent the Bahia Grande Unit of the Laguna Atascosa National Wildlife Refuge, right near the Rio Grande LNG export facility. I go about twice per month. When I am there, I especially enjoy seeing the wildlife. I like to photograph ospreys and I have been fortunate enough to see ocelots. Similar to above, I am concerned about the projects' impact on these species and other species in the project area. I can see the Rio Grande LNG and Texas LNG export facilities site from where I go in the refuge. I plan to continue this recreation activity indefinitely into the future. The whole purpose of my doing this activity is to enjoy the quiet, natural beauty of my natural surroundings. When I am doing this, I try to be one with my surroundings. I am concerned that construction and operation of the Rio Grande LNG and Texas LNG export facilities will ruin my ability to enjoy this recreational activity. I know I will be able to see construction of the facilities when I am there because they are so close. And I know I will be able to see the facilities when they are constructed. This would ruin my ability to enjoy being outside here. So too would noise and air pollution from construction and operation of the Rio Bravo pipeline system and Rio Grande LNG and Texas LNG export facilities.

11.  I am also concerned about the impacts of construction and operation of the Rio Bravo pipeline system as well as the Rio Grande LNG and Texas LNG export facilities on my other recreational pursuits. As noted, I enjoy birdwatching and fishing in the vicinity of the project. Being able to see and hear construction of the LNG export facilities and being able to see and hear the facilities if they are completed will completely ruin my enjoyment of fishing in the Bahia Grande and surrounding areas. Additionally, noise from construction of the Rio Bravo pipeline system will completely ruin my enjoyment of birding at the land

**086**

owned by the Carrizo Comecrudo Tribe of Texas. I have heard the noise from pipeline installation construction before and found it extremely unpleasant. I am confident that noise from construction will reach me when I am on this land.

12. I am concerned about other impacts of construction and operation of the Rio Grande LNG and Texas LNG export facilities and the Rio Bravo pipeline system as well. Every time I am in Brownsville and Port Isabel, I am travelling by car on either Highway 100 or Highway 48. And every time I am there, I drive in the immediate vicinity of the Rio Grande LNG and Texas LNG export facility. I am concerned that traffic in this area will increase and I will be adversely impacted by that increased traffic. I hate sitting in traffic and additional traffic when I am there would reduce my enjoyment of being in the area. I am also concerned about increased traffic caused by construction of the Rio Bravo pipeline system adjacent to the Carrizo Comecrudo Tribe of Texas land. Additionally, as noted, I am frequently in the immediate vicinity of the Rio Grande LNG and Texas LNG export facilities and will be there in the future. I have been around flares at other LNG export facilities and am aware that they generate a serious amount of heat that I can feel when I am near the flares. I am concerned that if the Rio Grande LNG and Texas LNG export facilities are constructed and placed into service, I will be near the flares for the facilities and will experience this incredibly uncomfortable heat.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Dated: 11/28/2023

Juan B Mancias

**087**

Juan Mancias

# DECLARATION OF DINA NUÑEZ

I, Dina Nuñez, do hereby state as follows:

1.      My name is Dina Nuñez. I am of legal age and competent to give this declaration, and everything that matters in this declaration is based on my personal knowledge, unless otherwise specified. I am giving this declaration for use in the legal challenge of Vecinos para el Bienstar de la Comunidad Costera  (Vecinos) to the proposed Rio Grande LNG and Texas LNG liquefied natural gas terminals as well as the proposed Rio Bravo oil pipeline.

2.      I am 60 years of age and live alone at my home in Brownsville, Texas. I have lived in Brownsville as of 1993, and have lived in my home as of 2007, and do not plan to move.

3.      I am currently an organizer for Border Workers United (BWU), a community organization which is building a workers leadership to develop a movement for labor justice in the border communities of Texas. I have worked for BWU for 3 years. Before working for BWU, I worked for 5 years as an organizer with Casa De Proyecto Libertad in Harlingen, Texas, and 11 years with Movimiento del Viaje.

4.      Through my work with BWU, I have also worked with Vecinos. Vecinos is a community organization formed to create an organizing movement and fight for labor and environmental justice.  I have worked as an organizer for Vecinos as of 2017 to fight for protecting our communities and environment. Vecinos holds community meetings every month, and I help with planning the meetings. Meetings cover different topics, such as knowing your rights, testimony, and protests.

5.      The leadership of Vecinos is selected for their commitment and participation in getting the community together. Occasionally, I help finance Vecinos´ activities. BWU also helps finance Vecinos' activities, providing gas cards, snacks, beverages, and gifts to give to members

**089**

who attend meetings and events. Vecinos is directed, supervised, and financed by people who will be affected by Rio Grande LNG´s building and operating the Rio Bravo oil pipeline and Texas LNG.

6.       Vecinos has fought against different facilities. Vecinos has worked throughout the last 10 years with Sierra Club and the Carrizo Comecrudo tribe. I have previous activism experience against the SpaceX facilities. I also have previous activism experience against Annova LNG's liquefied natural gas terminal (LNG).  In 2017, Texas Rio Grande Legal Aid met with Vecinos to fight against three LNG companies, Annova LNG, Rio Grande LNG, and Texas LNG as well as the Rio Bravo oil pipeline.

7.       I live about 15 miles away from Rio Grande LNG's site and about 15.5 miles away from the Texas LNG site. I also live 500 feet away from Highway 48. LNG terminal trucks use Highway 48 to bring materials for building terminals, and it has caused lots of traffic and noise. Traffic has increased my travel time, and it has caused air pollution. Building Rio Grande LNG and Texas LNG has also polluted the air and the water. I use Highway 48 and pass by the Rio Grande LNG and Texas LNG site about three times a month when I drive to Boca Chica Beach. Boca Chica Beach is about 5.5 miles away from the LNG sites. I like to go to the beach to relax and watch fishermen and animals. If LNG terminals are built, I would go less often to Boca Chica Beach due to air and sea pollution. Boca Chica Beach has been polluted by SpaceX, and building the LNG terminals will make it intolerable. There is not much vegetation in the Rio Grande Valley, but Boca Chica is one of the few places where there is. I like to go to Boca Chica at night to watch the stars on the beach. If LNG terminals are built, this will also ruin the scenery because of gas combustion, and I will not be able to watch the stars.

**090**

8.      I also like to go relax on the South Padre Island Beach. This beach is about 5 miles away from the Rio Grande LNG site and about  4.4 miles away from the Texas LNG site. If they build LNG terminals, I would not go as frequently because I would have to travel on Highway 48 and pass by LNG terminals which give off pollution. The view of LNG terminals would also make my experience less pleasant.

9.      I also like to go every weekend to the market on Buelah Lee Park where I can buy food from the locals and eat. Park Buelah Lee is about 3,5 miles away from the Rio Grande LNG site and about 3 miles from the Texas LNG site. If the terminals are built, I would not go to the market every weekend because of air pollution. LNG terminals would also ruin the scenery and make a less pleasant experience.

10.       I also like to go fishing on Boca Chica Beach and the Port Isabel Dock when my son visits with my grandchildren. If the Rio Grande LNG and Texas LNG terminals are built, we would go less often because of fear of air and sea pollution.

11.      If the Rio Grande LNG and Texas LNG terminals and the Rio Bravo oil pipeline are built, there will be a major increase of greenhouse gas emissions. There will be more droughts, tornadoes, and glaciers will continue to melt, causing floods.

I state under the penalty of perjury, under the laws of the United States,  that the foregoing is true and correct, on my knowledge, information, and belief.


Executed in November __, 2023.



_____

Dina Nuñez

3

**091**

## <u>DECLARATION OF ANTHONY RIVAS</u>

I, Anthony Rivas, hereby state as follows:

1.  I declare that I am a certified translator. I am certified to translate from the Spanish language to the English language, by the National Translator Certification Service. A copy of my curriculum vitae, which sets forth my qualifications is attached to this declaration.

2.  I further declare that I have translated the attached declaration from the Spanish language to the English language. I declare to the best of my abilities and belief that this is a true and correct translation of the Declaration of Dina Nunez.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Dated ___November 14___ , 2023

*Anthony T Rivas*
_____
Anthony T. Rivas

**092**

# ANTHONY T. RIVAS
## MIAMI, FLORIDA
### arivas2195@aol.com

**Former Full-Time Curriculum Development and Language Specialist, National Center for Interpretation, University of Arizona, Tucson, 2011-2020**

**Core Faculty, Agnese Haury Institute of Court and Medical Interpretation, University of Arizona, Tucson, 2011-2016**

**Trainer, State of Florida, Court Interpreter Orientation Workshop, 2010, 2011**

**Active Member of the International Association of Conference Interpreters (AIIC) – English: A. Spanish: A**

**United States Court Certified Interpreter (bidirectionally: Spanish/English)**

**Florida Court Certified Interpreter, Supreme Court of the State of Florida (bidirectionally: Spanish/English)**

**Certified Translator, American Translators Association (English into Spanish)**

**Certified Translator, National Translator Certification Service (Spanish into English/English into Spanish)**

**Sole Instructor, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011 Consortium Court Interpreter Oral Exam Skill Building Workshops, State of Florida (privately sponsored)**

## EDUCATION:

Graduate Work in Spanish Linguistics, University of Illinois, Urbana-Champaign, Illinois
Bachelor of Arts in Spanish, conferred with Highest Honors, Florida International University, Miami, Florida.
Certificate in Linguistic Studies, Florida International University, Miami, FL

## UNIVERSITY STUDENT ACADEMIC HONORS AND DISTINCTIONS:

Outstanding Student Award, Modern Language Department, Florida International University, College of Arts and Sciences.
Who's Who Among Students in American Universities and Colleges.

## PROFESSIONAL ORGANIZATIONS AND SOCIETIES:

Active Member of the International Association of Conference Interpreters (AIIC) – English A. Spanish A
Active Member of the American Translators Association (ATA)
Honorary Lifetime Member, Association of Translators and Interpreters of Florida (ATIF)

## PROFESSIONAL PUBLICATIONS AND LECTURES:

**850 Colombian Regionalisms into US English,** Anthony T. Rivas, paper read at the 2012 Annual Meeting of the California Court Interpreters Association (CCIA), Los Angeles, California

**Polish Up Your Consecutive,** Anthony T. Rivas, paper read at the 2010 Annual Meeting of the California Court Interpreters Association (CCIA), Santa Monica, California

**Interpretapes – Medical Edition, 2nd Edition: Five Doctor-Patient Medical Consultations,** Armando Valles, Roseann Gonzalez, and Anthony T. Rivas. Publisher: National Center for Interpretation (2010) ISBN-0983040818, 9780983040811

**Medical Interpretapes,** Roseann Gonzalez, and Anthony T. Rivas. Publisher: University of Arizona, Tucson (2004) ISBN-0983040818, 9780983040811

**The Spanish Talking Manual,** Roseann Gonzalez, Anthony T. Rivas et al., National Center for Interpretation, University of Arizona.

**Mysteries and Enigmas of Cuban Spanish,** read and released at the 21st Annual Meeting and Educational Conference of the National Association of Judiciary Interpreters and Translators (NAJIT) http://www.najit.org/members_only/proteus/v9n3/rivas_v9n3.htm

**Issues in Spanish Legal Translation Localization,** read and released at the 17th Annual Meeting and Educational Conference "World Beyond Borders" of the National Association of Judiciary Interpreters and Translators (NAJIT)

**Translating into "Spanish for Spain" by Latin Americans: Pitfalls and Problems,** read at the 35th Annual Conference of the American Translators Association (ATA), October 12–16, 1994, Austin, Texas and published in Vistas, Proceedings of the 35th Annual Conference of the American Translators Association.

## PROFESSIONAL PROJECTS AND PUBLICATIONS IN PROGRESS:

**Rivas' Bilingual Glossary of Cuban/Miami Cuban Spanish.** Over 1,500 words and idioms compiled and translated into American English and American Slang, where appropriate. Research is ongoing. Work for publication will conclude upon reaching the 2000th word. Scheduled for Publication: Soon.

**Rivas' Bilingual Glossary of Colombian Spanish.** Over 1,500 words and idioms compiled and translated into American English and American Slang. Work for publication will conclude upon reaching the 2000th word. Research is ongoing. Scheduled for Publication: Soon.

**REFERENCES:**

Ms. Karla Arce, Head of Legal and Conference Interpretation, Protranslating, Miami, FL  karze@protranslating,com

Mr. James Clark, CEO and Owner, Ahora Translations,  Houston TX  ahora@ahoratranslations.com

Mr. Art Garrido, Manager, MFM Conference Interpretations, Doral, FL agarrido@mfmci.com

## ANTHONY T. RIVAS
## RECENT AND SELECT CONFERENCES/ACTIVITIES INTERPRETED
## (ENGLISH-SPANISH, SPANISH-ENGLISH)

### THE FOLLOWING IS JUST A CROSS-SAMPLE. AN EXTENSIVE LIST OF SEVERAL   PAGES MAY BE SENT UPON REQUEST.

## Most Recent

Primera, Inc. Financial Services Conference, Online, June 30 and July 1, 2022

Holland and Knight Law Firm Conference, Online, June 29 and June 30, 2022

International Basketball Federation, Online, Bolivian and Honduran Meetings, June 3, 2022

International Chamber of Commerce Meetings, May 18 thru 20, 2022, Aventura, FL

International Basketball Federation, Online, Zone Board Meeting, April 22, 2022

International Basketball Federation, Online, Finance and Exec Comm. Meetings, April 21, 2022

Florida International Banking Association Conference, February 28 thru March 2, 2022 Doral, FL

CONCACAF Board Meeting, Online, September 21, 2021

Florida International University Fishing Informational Workshop, Online, June 30, July 1, 2021

## Select Activities:

**094**

First Presidential Debate on America TV/Miami, September 29, 2020 –
Interpreter for Presidential Candidate Donald J. Trump

Third Presidential Debate on CNN en Español, October 19, 2016 –
Interpreter for Presidential Candidate Donald J. Trump

Second Presidential Debate on CNN en Español, October 9, 2016 –
Interpreter for Presidential Candidate Donald J. Trump

President Obama´s Speech on Gabrielle Gifford´s Assailment, GEN TV,
Channel 8. January, 2011

Presidential Debates, Telemundo Spanish Nationwide Network, Republican
John McCain versus Democrat Barack Hussein Obama, interpreted for
Barack Obama, 2008

Presidential Debates, Telemundo Spanish Nationwide Network, Interpreted for
George Bush, 2004

President George Bush's State-of-the-Union Addresses, February, 2005,
2006, 2007 and 2008

# DECLARACIÓN DE DINA NUNEZ

Yo, Dina Nunez, por la presente declara lo siguiente:

1.    Mi nombre es Dina Nunez. Yo soy mayor de edad y competente para dar esta declaración y todo importa en esta declaración se basa en mi conocimiento personal, a menos que se especifique lo contrario. Doy esta declaración para su uso en el desafío legal de Vecinos para el Bienstar de la Comunidad Costera (Vecinos) a los propuestos terminales de exportación de gas natural licuado de Rio Grande LNG y Texas LNG y al propuesto de el oleoducto de Rio Bravo.

2.    Yo tengo 60 años y vivo sola en mi casa en Brownsville, Texas. Yo ha vivido en Brownsville desde 1993 y ha vivido en mi casa desde 2007 y no tengo planes de mudarme.

3.    Actualmente soy organizadora para Border Workers United (BWU), una organización comunitaria que construye un liderazgo de trabajadores para desarrollar un movimiento por la juticia laboral en las comunidades fronterizas de Texas. He trabajado por BWU por 3 años. Antes de trabajar con BWU trabajé como organizadora con Casa De Proyecto Libertad en Harlingen, Texas por 5 años y con Movimiento del Viaje por 11 años.

4.    A través de mi trabajo con BWU, trambién trabajo con Vecinos. Vecinos es una organización comunitaria, que se formó para crear un movimiento organizativo y luchar por la justiciar laboral y ambiental. He trabajado como una organizadora para Vecinos desde 2017, para luchar por proteger a nuestras comunidades y al medioambiente. Vecinos tiene reunions comunitaries cada mes y yo ayudo a planificar las reuniones. Las reuniones cubren diferentes temas como conocer tus derechos, testimonios, y protestas.

5.    Los liderazgo de Vecinos se selecciona por su compromiso y participación en reunir la comunidad.De vez en cuando ayudo a financiar las actividades de Vecinos. BWU

**096**

tambien ayuda financiar las actividades de Vecinos dándoles tarjetas para gasolina, aperitivos, bebidas, y regalos para dar a los miembros que asisten a reunions y eventos. Vecinos es dirigido, supervisado, y financiado por personas que se verán afectadas por la construcción y operación de Rio Grande LNG, el oleoducto de Rio Bravo, y Texas LNG.

6.      Vecinos ha luchado contra diferentes instalaciones. Vecinos a trabajado con Sierra Club y la tribu de Carrizo Comecrudo durante los últimos 10 años. Yo tengo experiencia previa de activism contra la instalacione de SpaceX. Tambien tengo experiencia previa de activism contra el terminal de gas natural licuado (GNL) de Annova LNG. En 2017, Texas RioGrande Legal Aid se reunió con Vecinos para luchar contra tres compañías de GNL, Annova LNG, Rio Grande LNG, y Texas LNG y el oleoducto, Rio Bravo.

7.      Vivo a unas 15 millas del sitio de Rio Grande LNG y a unas 15.5 millas del sitio de Texas LNG. También vivo 500 pies de la carretera 48. Los camiones para los terminales GNL utilizan la carretera 48 para traer materiales para la construcción los terminales y ha provocado mucho tráfico y ruido. El tráfico ha aumentado mi tiempo de viaje y ha contaminado el aire. La construcción de Rio Grande LNG y Texas LNG también a contaminado el aire y la agua. Yo utilize la Carretera 48 y paso por el sitio de Rio Grande LNG y Texas LNG unas tres veces al mes cuando manejo a la playa de Boca Chica. La playa de Boca Chica está a unos 5.5 millas de los sitios de GNL. Me gusta ir a la playa a relajarme y observer a los pescadores y a los animales. Si se construyen las terminales de GNL, yo iría menos a la playa de Boca Chica por la contaminación del aire y el mar. La playa de Boca Chica ya tiene contaminación por SpaceX y la construcción de los terminals de GNL lo hará intolerable. No hay mucha vegetación en el Valle del Río Grande, pero Boca Chica es uno de los pocos lugares donde hay. Me gusta ir a Boca

**097**

Chica de noche a mirar las estrallas en la playa. Si los terminales GNL de construyen también arruinará el paisaje por la combustión de gases y no podré ver las estrellas.

8.    También me gusta ir a relajarma en la playa de la Isla de South Padre. Esta playa es a unas 5 millas del sitio de Rio Grande LNG y a unas 4.4 millas del sitio de Texas LNG. Si construyen los terminales de GNL no iría con tanta frecuancia porque tendría que viahar por la Carretera 48 y pasar los terminales de GNL que emiten contaminación. La vista de las terminales de GNL también haría que mi experiencia fuera menos agradable.

9.    Cada fin de semana también me gusta ir al mercado en el parquet de Buelah Lee donde puedo comprar comida de los lugareños y comer. El parque de Buelah Lee a unas 3.5 millas del sitio de Rio Grande LNG y a unas 3 millas del sitio de Texas LNG. Si se construyen los terminales de GNL no iría al mercado todos los fines de semana por la contaminacion del aire. Los terminales de GNL también arruinaría el paisaje y haría la experiencia menos agradable.

10.    También me gusta ir a pescar en la playa de Boca Chica y en el embarcadero de Port Isabel cuando mi hijo visita con mis nietos. Si los terminales de Rio Grande LNG y Texas LNG se construyen nosotros iríamos menos por miedo a la contaminación del aire y el mar.

11.    Si los terminales de Rio Grande LNG y Texas LNG y el oleoducto de Rio Bravo se construyen, habrá un gran aumento de las emisiones de gases de efecto invernadero. Habrá más sequías, tornados, y los glaciares seguirán derritiéndose provocando inudaciones.

Declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdadero y correcto según mi conocimiento, información y creencia.

Ejecutado en noviembre 13, 2023.

**098**

Dina Nunez

4

**099**

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2023, I have

served the foregoing Addendum to the Joint Opening Brief for

Petitioners on all registered counsel through the Court's electronic

filing system (ECF).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.
org