**FEDERAL ENERGY REGULATORY COMMISSION**
**WASHINGTON, D.C.  20426**

May 1, 2024

***Via ECF***

Mark J. Langer
Clerk of the Court
United States Court of Appeals
  for the District of Columbia Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

**Re:**  *City of Port Isabel, et al. v. FERC*, Nos. 23-1175, *et al.*
         Rule 28(j) Letter (oral argument scheduled for May 17, 2024)

Dear Mr. Langer:

On April 30, 2024, the Court issued its opinion in *Alabama Municipal Distributors Group v. FERC*, No. 22-1101, which addressed a challenge to the Federal Energy Regulatory Commission's decision not to use the social cost of carbon tool in its analysis of a natural gas pipeline.  A copy is attached.

In *Alabama Municipal*, Sierra Club argued that the Commission violated the National Environmental Policy Act by not using the tool to assess the significance of the pipeline's greenhouse gas emissions.  *See* Slip Op. 11.  Sierra Club has made the same argument here.  *See* Pet'rs Br. 44-51.

In *Alabama Municipal*, the Commission estimated the volume of the pipeline's emissions and compared those emissions against state and national emission levels.  Slip Op. 11.  The Commission also "estimated the social cost of carbon, [and] publicly disclosed those

estimates." *Id.* 12.  The Commission conducted a substantially identical analysis in this case.  *See* Resp't Br. 50-51.

In both *Alabama Municipal* and here, the Commission found that it could not rely on the social cost of carbon tool to determine whether those greenhouse gas emissions would result in significant climate change impacts.  In both cases, the Commission explained that the tool is not appropriate for use in assessing individual infrastructure projects.  *See* Slip Op. 11; Resp't Br. 43-47.

In *Alabama Municipal*, the court upheld the Commission's "comparative analysis," finding it "indistinguishable from the environmental analysis" previously approved in *Center for Biological Diversity v. FERC,* 67 F.4th 1176, 1183-84 (D.C. Cir. 2023).  Slip Op. 11, 12.  The Court held that "FERC here has 'not acted unreasonably in finding the social cost of carbon tool inadequately accurate to warrant inclusion under the National Environmental Policy analysis.'" *Id.* 13 (quoting *Ctr. for Biological Diversity*, 67 F.4th at 1184) (cleaned up).

In *Alabama Municipal*, the court also rejected the argument that the Commission should have looked to its policy statement – since withdrawn – to assess the significance of a project's greenhouse gas emissions.  Slip Op. 12-13.  Sierra Club has raised the same argument here.  *See* Pet'rs Br. 53.

Respectfully submitted,

*/s/ Robert M. Kennedy*
Tel.:  (202) 502-8904
robert.kennedy@ferc.gov

*Counsel for Respondent*
*Federal Energy Regulatory Commission*

cc:  service list

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 5, 2023        Decided April 30, 2024

No. 22-1101

ALABAMA MUNICIPAL DISTRIBUTORS GROUP, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHERN NATURAL GAS COMPANY, L.L.C., ET AL.,
INTERVENORS

———

Consolidated with 22-1171, 22-1256, 22-1273

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Nathan Matthews* argued the cause for petitioners Sierra
Club and Healthy Gulf.  With him on the briefs was *Rebecca
McCreary*.

2

*Randolph Lee Elliott* argued the cause for Municipal petitioners.  With him on the briefs were *James R. Choukas-Bradley* and *Joshua L. Menter.*

*Carol J. Banta*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Deputy Solicitor.  *Matthew W.S. Estes*, Attorney, entered an appearance.

*Brian D. O'Neill* argued the cause for respondent-intervenors Southern Natural Gas Company, L.L.C., et al. With him on the brief were *Michael R. Pincus*, *Sandra Y. Snyder*, *Richard P. Bress*, *J. Patrick Nevins*, and *Eric J. Konopka.*

Before: SRINIVASAN, *Chief Judge*, WALKER, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Natural gas companies must obtain "a certificate of public convenience and necessity" from the Federal Energy Regulatory Commission before they construct, operate, or expand an interstate natural gas pipeline. 15 U.S.C. § 717f(c)(1)(A).  In this case, FERC certified the Evangeline Pass Expansion Project — a series of expanded pipelines, compression facilities, and meter stations in the Southeastern United States.  Environmental groups challenge that certification, alleging that FERC improperly applied the National Environmental Policy Act.  42 U.S.C. § 4321 *et seq.*

FERC's certification was reasonable and reasonably explained.  So was its decision to deny a windfall to a pipeline

3

owner's existing customers. We therefore deny the petitions for review.

## I. Background

FERC and the Department of Energy share regulatory authority over natural gas. Section 7 of the Natural Gas Act allows FERC to issue "a certificate of public convenience and necessity" to any entity that seeks to construct, operate, or expand an interstate natural gas pipeline. 15 U.S.C. § 717f(c)(1)(A).

However, Section 7 does not reach foreign commerce. *See* 15 U.S.C. § 717f. Foreign commerce instead falls under Section 3 of the Natural Gas Act. *See* 15 U.S.C. § 717b. That section grants FERC regulatory authority over the construction, operation, and expansion of export facilities. 15 U.S.C. § 717b(e).

But no section of the Natural Gas Act gives FERC authority over the exported gas itself. Instead, the "exclusive authority" over exported gas belongs to the Department of Energy. *Sierra Club v. FERC*, 827 F.3d 36, 40 (D.C. Cir. 2016) ("*Freeport*") (citing 42 U.S.C. § 7151(b)).

Thus, we end up with the following distinct scopes of authority mandated by Congress:

| Interstate Pipelines | FERC |
|---|---|
| Export Facilities | FERC |
| Natural Gas Exports | Department of Energy |

No matter which scope of authority is invoked, FERC (for interstate pipelines or export facilities) or the Department of Energy (for natural gas exports) must consider the National

4

Environmental Policy Act. 42 U.S.C. § 4321 *et seq*. Among other things, the Act requires the relevant government entity to consider a project's potential environmental impact in one of two ways — either through an environmental impact statement (the more onerous analysis) or an environmental assessment (the less onerous analysis). *See* 42 U.S.C. § 4332(2)(C). Either way, the Act requires the relevant government entity to consider any actions that are "connected" to the proposed project. *See* 40 C.F.R. § 1501.9(e)(1).[1]

In 2020, Tennessee Gas Pipeline Company and Southern Natural Gas Company applied under Section 7 of the Natural Gas Act for approval of the Evangeline Pass Expansion Project.[2] Tennessee Gas wanted to construct and replace pipelines and compression facilities. Similarly, Southern wanted to build a compression facility and meter stations. Although pipelines, compression facilities, and meter stations serve different functions, the bottom-line goal of the Evangeline Pass Project was to move more gas.

The Sierra Club protested the applications.[3] Although it asserted different arguments at different stages of the

---

[1] When certification for the Evangeline Pass Expansion Project was sought — February 2020 — the definition of "connected actions" was listed in 40 C.F.R. § 1508.25(a)(1). The definition was later moved to, and remains under, 40 C.F.R. § 1501.9(e)(1). In this opinion, we cite to the regulation as it is today.

[2] Although Tennessee Gas and Southern's projects were listed as separate projects in the FERC order, both involved the same pipeline. For simplicity, we refer to both projects as the Evangeline Pass Expansion Project.

[3] Healthy Gulf joined the Sierra Club in its protest. For simplicity, we will refer to both petitioners as the Sierra Club.

5

certification process, Sierra Club ultimately said FERC violated the National Environmental Policy Act by (1) not considering the environmental effects of four other natural-gas projects it thinks are connected to the Evangeline Pass Project; (2) not considering the indirect environmental effects of gas from the Evangeline Pass Project after that gas is exported; and (3) not relying on an analytical tool known as the social cost of carbon metric.[4]

In addition, a municipal customer of Southern — the Alabama Municipal Distributors Group — argued that a new lease from Southern to Tennessee Gas may mean more profits for Southern, so Alabama Municipal should receive a portion of those profits.[5]  The new lease was made possible by the Evangeline Pass Project.

FERC unanimously issued a Certificate Order to Tennessee Gas and Southern, denying all objections. *Tennessee Gas Pipeline Co.*, *LLC*, 178 FERC ¶ 61,199, at 46-48 (Mar. 25, 2022).  It reaffirmed its determination on rehearing.  *Tennessee Gas Pipeline Co., LLC*, 180 FERC ¶ 61,205, at 43 (Sept. 29, 2022).

The Sierra Club and Alabama Municipal timely petitioned for review.  We now deny those petitions.

---

[4] The Sierra Club's initial "protest" contained only the last two of these three arguments, and that protest came as comments to the draft EIS published in the Federal Register.  Sierra Club only later made its connected actions argument after FERC issued its certification decision.

[5] Other customers of Southern also raise this challenge.  Because they make the same arguments as Alabama Municipal and are similarly situated, we will refer simply to Alabama Municipal.

6

## II. The Sierra Club's Petition Lacks Merit

The Sierra Club raises the same three challenges that it made before FERC on rehearing. Each challenge arises under the National Environmental Policy Act and its implementing regulations. We review such "challenges under the familiar standards of the Administrative Procedure Act to determine whether the agency action was arbitrary and capricious or contrary to law." *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (cleaned up); *see* 5 U.S.C. § 706(2)(A). Our deferential review does "not ask whether record evidence could support the petitioner's view of the issue, but whether it supports [FERC's] ultimate decision." *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

## A. The Environmental Impact Statement Did Not Exclude Actions "Connected" To The Evangeline Pass Project

The Sierra Club first argues that FERC failed to consider the full scope of environmental effects of the Evangeline Pass Project because FERC's environmental impact statement did not include four other natural-gas projects that the Sierra Club says are "connected actions." As described by FERC, those projects are (1) a new terminal that exports natural gas; (2) an amendment to increase the amount of gas that terminal can export; (3) a new pipeline that serves as a hub for that terminal, connecting to several spokes; and (4) two new pipelines that are spokes on that hub.[6] *See* JA 90-91. Gas from the Evangeline Pass Project will reach the hub through a *different*

---

[6] The four projects are called (1) the Plaquemines LNG Terminal; (2) the Plaquemines LNG Terminal Amendment; (3) the Gator Express Pipeline; and (4) the East Lateral XPress and Venice Extension projects.

7

spoke and then flow through the hub to the terminal, where it will be exported.

The standard for whether projects are connected for purposes of the National Environmental Policy Act is laid out by agency regulations that the Sierra Club does not challenge. "Actions are connected if they: (i) Automatically trigger other actions that may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1501.9(e)(1).

Because challenges to pipeline certifications are common, this court has "developed a set of factors that help clarify when natural gas infrastructure projects — which frequently involve some degree of interconnection with other projects in the area — may be considered separately under" the National Environmental Policy Act. *Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022) (cleaned up). In particular, we examine "the projects' degree of physical and functional interdependence, and their temporal overlap." *Id.* (cleaned up).

Projects lack a "physical and functional interdependence" when each has "substantial independent utility." *City of Boston Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018) (cleaned up). And projects lack a "temporal overlap" when they occur "on separate timelines." *Food & Water Watch*, 28 F.4th at 292 (cleaned up). Timelines are, of course, separate when they do not significantly overlap. But even when projects occur "near in time to one another," we still do not consider them "connected actions" so long as the timing "does not undermine the functional independence of the projects." *Id.* After all, most events that occur near in time are independent

8

of each other — like a hockey game played on the same day as a basketball game.

Here, substantial evidence supports FERC's finding that the various projects identified by the Sierra Club were not "connected actions." *See* 40 C.F.R. § 1501.9(e)(1).

To begin with, there's substantial evidence that each project is physically and functionally independent of the Evangeline Pass Project. The terminal (first project), through its hub (third project), can receive "upstream sources of supply gas in many different ways" — not just from the Evangeline Pass Project. JA 101. That will remain true even if FERC amends the terminal's certificate to allow additional export capacity (second project). And the two spokes on the terminal's hub (fourth project) are "different gas supply options on different pipeline systems" that do not receive gas from the Evangeline Pass Project. JA 97. Plus, none of the projects share ownership with the Evangeline Pass Project.

There's also substantial evidence that three of the four projects proceeded on quite different timelines than the Evangeline Pass Project, which was proposed in February 2020 and approved by FERC in March 2022. The first and third projects do not overlap with that timeline at all, while the second barely overlaps.[7]

True, the Evangeline Pass Project's timeline overlaps more with the timelines for the fourth project's two pipelines.[8]

---

[7] The first and third projects were proposed in 2017 and approved in 2019. The second was proposed in 2022, just two weeks before FERC's approval of the Evangeline Pass Project.

[8] One part of the fourth project was proposed in September 2020 (seven months after the Evangeline Pass Project's proposal) and the

9

But projects "near in time to one another" may not be "connected actions." *Food & Water Watch*, 28 F.4th at 292. Because FERC reasonably found that the fourth project will proceed even if the Evangeline Pass Project does not, the timing "does not undermine the functional independence of the projects." *Id.* That's especially true here where the fourth project constructs two spokes on a hub, neither of which is the spoke that receives gas from the Evangeline Pass Project.

We therefore hold that the record "adequately supports [FERC's] ultimate decision" that the Evangeline Pass Project was not "connected" to the other projects. *Florida Gas Transmission Co.*, 604 F.3d at 645.

## B. FERC Did Not Need To Evaluate The Environmental Effects Of Exported Natural Gas

The Sierra Club next argues that FERC erred by failing to account for the environmental impact of two ongoing authorizations (by the Department of Energy) to export gas that may include some of the gas flowing through the Evangeline Pass pipeline system. FERC determined it was not required to evaluate indirect effects of the exported gas when it authorized the Evangeline Pass Project.

We agree.

FERC's decision relied on the limits of its authority under the Natural Gas Act and on our precedents. The Natural Gas Act excludes authority over *foreign* transport from FERC's authority over *interstate* transport. 15 U.S.C. § 717f(c); *see also City of Oberlin v. FERC*, 39 F.4th 719, 725-26 (D.C. Cir.

---

other was proposed in November 2021 (a year and nine months after the Evangeline Pass Project's proposal).

10

2022).  And as we explained in *Freeport*, "the Department of Energy, not [FERC], has sole authority to license the export of any natural gas."  *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) ("*Freeport*").  So FERC does "not have to address the indirect effects of the anticipated *export* of natural gas." *Id.*; *see also Center for Biological Diversity*, 67 F.4th at 1185 (FERC need not "consider the indirect effects of actions beyond its delegated authority").[9]

The Sierra Club responds to a precedent that's on point (*Freeport*) with a precedent that's not (*Sabal Trail*).  It reads *Sabal Trail* to say that FERC must consider intrastate consumption when authorizing transportation across state lines.  It then argues that FERC here must likewise consider export consumption when authorizing transportation across state lines.  *See Sierra Club v. FERC*, 867 F.3d 1357, 1371-73 (D.C. Cir. 2017) ("*Sabal Trail*").  But as *Sabal Trail* explains, there's a difference between *intrastate* gas effects and *exported* gas effects.

If anything, *Sabal Trail* cuts against the Sierra Club.  It reaffirmed that an "agency has no obligation to gather or consider environmental information if it has no statutory authority *to act on that information*" — and here FERC has no statutory authority over exported gas.  *Sabal Trail*, 867 F.3d at 1372; *see also id.* ("when the agency has no *legal* power to prevent a certain environmental effect, there is no decision to inform, and the agency need not analyze the effect in its [National Environmental Policy Act] review").[10]

_____

[9] For the same reason, FERC did not have to analyze any of the Department of Energy's export authorizations as "connected actions."

[10] Admittedly, *Freeport*, *Sabal Trail*, and *Center for Biological Diversity* involved certifications of exports under Section 3 of the

11

In short, Congress gave export authorization to the Department of Energy — not FERC. So FERC did not err when it declined to consider the environmental effects of exported gas that flows through Evangeline Pass.

## C. FERC Was Not Required To Use The Social Cost Of Carbon Tool

The Sierra Club's final challenge to FERC's environmental impact statement faults FERC for not using an environmental metric known as the "social cost of carbon" — a tool that puts a dollar figure on every ton of emitted greenhouse gases. Instead, FERC analyzed the Evangeline Pass Project's greenhouse gas emissions by conducting a comparative analysis. That analysis estimated the volume of direct emissions, compared those projections against state and national emissions, and then calculated the percentage amount that the Evangeline Pass Project would add to state and national emissions.

FERC did not ignore the social cost of carbon tool. Rather, FERC explained that it was not relying on the tool because of pending litigation challenging it, and because FERC had "not determined which, if any, modifications are needed to render that tool useful for project-level analyses." JA 42 n.141. But

_____

Natural Gas Act, whereas this case concerns the certification of an interstate pipeline under Section 7. But in those cases, as here, the key question was, "What factors can FERC consider when regulating in its proper sphere?" *Sabal Trail*, 867 F.3d at 1373. And Congress was clear about FERC's Section 7 scope of authority: It specifically "define[d] 'interstate commerce' in a way that excludes foreign commerce." *City of Oberlin*, 39 F.4th at 726. So FERC's considerations of exports falls "outside FERC's Section 7 authority." *Id.*

12

even though FERC did not rely on the tool, FERC staff still estimated the social cost of carbon, publicly disclosed those estimates, and shared them in the environmental impact statement.

FERC's process here is indistinguishable from the environmental analysis we recently upheld in *Center for Biological Diversity*. 67 F.4th at 1183-84. There, FERC also analyzed the significance of a project's greenhouse gas emissions. *Id.* FERC considered using the social cost of carbon tool, but it ultimately rejected the approach because FERC had not yet identified a workable means of applying the tool. *Id.* So FERC instead provided a comparative analysis by estimating the volume of direct emissions, comparing those projections against state and national emissions, and calculating the percentage amount that the project would add to state and national emissions — just as FERC did here. *Id.*; *see also EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (FERC acted reasonably in finding the social cost of carbon tool "inadequately accurate to warrant inclusion").

To be sure, after FERC's action in *Center for Biological Diversity* but before its action in this case, FERC issued a policy statement on measuring the significance of greenhouse gas emissions. Under that 2022 policy statement, projects expected to emit 100,000 or more metric tons of greenhouse gases per year would be presumed to have a significant environmental impact. *See Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108, at 79-81 (Feb. 18, 2022). The policy statement served, to some extent, as an alternative to the use of the social cost of carbon tool to assess whether a project's emissions would be environmentally significant.

13

But later that year, FERC withdrew the policy statement by demoting it to "draft" form — which means FERC might never adopt the policy.  And in this case, FERC cited the policy's "draft" status as a reason why it chose not to apply it.  *See* Sierra Club Br. 59 (conceding that the policy was merely "draft guidance").

In light of the policy statement's conversion to draft status, the Sierra Club has not identified a meaningful distinction between this case and *Center for Biological Diversity*.  As in that case, there is no final policy statement for FERC to apply here.  And as there, FERC here has "not acted unreasonably in finding the social cost of carbon tool inadequately accurate to warrant inclusion under [the National Environmental Policy Act] analysis."  *Center for Biological Diversity*, 67 F.4th at 1184 (cleaned up).

### III. Alabama Municipal's Petition Lacks Merit

We turn at last to Alabama Municipal's separate petition.  It does not object to the Evangeline Pass Project itself.  Rather, Alabama Municipal wants FERC to give it a future credit on the existing rates it pays.

The crux of Alabama Municipal's argument is as follows.  As an owner of the Evangeline Pass Project, Southern expects to make money from the expansion project by leasing the increased transportation capacity to the Tennessee Gas Pipeline Company.  The new revenue Southern receives from the increased leasing is "excessive" revenue for Southern, says Alabama Municipal.  So FERC should prevent the excess by granting Alabama Municipal a future credit that would, in effect, revise customer rates downward.

14

FERC's decision to deny Alabama Municipal's requested credit was both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As FERC noted when rejecting the argument, Alabama Municipal exists outside the scope of the new lease capacity. It will not pay for the capacity. It will not use the capacity. And it will not bear any risks associated with the capacity — a finding consistent with established FERC policy. *See Gulf South Pipeline Co.*, 119 FERC ¶ 61,281 (2007).

Because Alabama Municipal will bear none of the new lease capacity's costs or risks, it is entitled to none of the benefits. To hold otherwise would provide a windfall to Alabama Municipal. And Alabama Municipal has identified no legal authority that requires FERC to award it such a windfall. *Cf.* Florence White Williams, *The Little Red Hen* (1918).

\*  \*  \*

All of FERC's decisions in this case were reasonable and reasonably explained. We therefore deny the petitions for review.

*So ordered.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 1, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all registered users by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>*/s/ Robert M. Kennedy*</u>
Robert M. Kennedy
Senior Attorney