Nos. 23-1175(L), 23-1222

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITY OF PORT ISABEL, et al.,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

TEXAS LNG BROWNSVILLE LLC,
*Respondent-Intervenor*.

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF OF *AMICUS CURIAE* EQT CORPORATION
IN SUPPORT OF PETITION FOR REHEARING**

Z.W. Julius Chen
Emily P. Mallen
Lide E. Paterno
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
chenj@akingump.com

*Counsel for* Amicus Curiae *EQT Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and *Amici***

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief of Petitioners:  EQT Corporation.

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 28(a), counsel for *amicus curiae* states that EQT Corporation is a publicly traded corporation and one of the largest producers of natural gas in the United States.  EQT Corporation does not have any parent corporation, and no publicly held corporation owns 10% or more of EQT Corporation stock.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for Petitioners.

**C.    Related Cases**

*City of Port Isabel v. Federal Energy Regul. Comm'n*, Nos. 23-1174, 23-1221 (D.C. Cir.).


*/s/ Z.W. Julius Chen*
Z.W. Julius Chen

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................i

GLOSSARY ................................................................................................v

IDENTITY AND INTEREST OF *AMICUS CURIAE*...............................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................2

ARGUMENT .........................................................................................4

      I.    VACATUR UPENDS RELIANCE INTERESTS CRITICAL TO THE ORDERLY DEVELOPMENT OF NATURAL GAS INFRASTRUCTURE...........................................................................4

      II.    DISRUPTING THE BUILDOUT OF NATURAL GAS INFRASTRUCTURE WILL HARM CONSUMERS, THE NATION'S ENERGY SECURITY, AND THE GLOBAL CLIMATE...................................................................................8

CONCLUSION ...................................................................................13

# TABLE OF AUTHORITIES

## CASES:

*Louisiana v. Biden*,
No. 2:24-cv-406, 2024 WL 3253103 (W.D. La. July 1, 2024) ...........................7

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989)...........................................................................................2

*NAACP v. Federal Power Comm'n*,
425 U.S. 662 (1976)...........................................................................................8

*Sierra Club v. United States Dep't of Energy*,
867 F.3d 189 (D.C. Cir. 2017)..........................................................................8

*Sierra Club v. United States Dep't of Energy*,
107 F.4th 1012 (D.C Cir. 2024).....................................................................4, 5

*Stand Up for California! v. United States Dep't of the Interior*,
994 F.3d 616 (D.C. Cir. 2021)...........................................................................2

## STATUTES:

15 U.S.C.
§ 717b.................................................................................................................5
§ 717b(a) ...........................................................................................................5
§ 717b(c) ...........................................................................................................5

## OTHER AUTHORITIES:

Central Intelligence Agency, The World Factbook (2021 Archive),
*Natural gas—proved reserves* ........................................................................11

International Energy Agency, *CO$_2$ Emissions in 2023* (Feb. 2024)...................9, 10

International Energy Agency, *Global Energy Review:  CO2 Emissions
in 2021* (Mar. 2022) .........................................................................................10

Policy Statement Regarding Long-Term Authorizations to Export
Natural Gas to Non-Free Trade Agreement Countries, 83 Fed. Reg.
28,841 (June 21, 2018) .......................................................................................7

Press Release, *Statement from President Joe Biden on Decision to Pause Pending Approvals of Liquefied Natural Gas Exports* (Jan. 26, 2024) ...................................................................................6

U.S. Energy Information Administration, *Annual Energy Outlook AEO2023* (Mar. 2023) .....................................................................11

U.S. Energy Information Administration, *Frequently Asked Questions (FAQs): What is U.S. electricity generation by energy source?* (Feb. 29, 2024) ............................................................................11

U.S. Energy Information Administration, *Today in Energy* (June 9, 2021) ...................................................................................9

U.S. Energy Information Administration, *U.S. Energy-Related Carbon Dioxide Emissions, 2019* (Sept. 30, 2020) ...........................9, 10

## GLOSSARY

| | |
|---|---|
| Department | Department of Energy |
| EQT | EQT Corporation |
| FERC | Federal Energy Regulatory Commission |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| Project | Texas LNG Brownsville LLC Project |
| SEIS | Supplemental Environmental Impact Statement |
| Texas LNG | Texas LNG Brownsville LLC |

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

EQT Corporation ("EQT") is one of the largest natural gas producers in the United States. One of EQT's missions is to provide energy security to the United States and lower global carbon emissions by reducing the world's reliance on coal and other carbon-intensive energy sources. To fulfill those critical goals, EQT is investing millions of dollars to transport natural gas from the Appalachian Basin to liquefied natural gas ("LNG") terminal infrastructure on the U.S. Gulf Coast, where EQT has committed approximately two million metric tonnes per year of natural gas for export.

Given its position in the natural gas industry, EQT can speak to the immensely disruptive consequences of the panel's order vacating the Federal Energy Regulatory Commission's ("FERC") approval of the construction, siting, and operation of the Texas LNG Brownsville LLC ("Texas LNG") project, which would enable the critical provision of clean energy to U.S. allies around the world, consistent with the Natural Gas Act "public interest" determination the Department of Energy made and EQT relied upon in contracting with Texas LNG.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, counsel for EQT states: (i) no counsel for any party authored this brief in whole or in part; (ii) no party or counsel for a party contributed money intended to fund the preparation or submission of this brief; and (iii) no person other than *amicus curiae* or its counsel contributed money intended to fund the brief's preparation or submission.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

EQT agrees that the panel erred in adopting a new rule requiring FERC to prepare a supplemental environmental impact statement ("SEIS") under the National Environmental Policy Act ("NEPA") whenever the agency expands its analysis—even if (as here) additional information does not indicate any new significant environmental impact. But even setting aside that manifest error—which itself warrants rehearing—EQT submits this brief to emphasize the serious threats independently posed by the panel's remedial decision to vacate FERC's approval of the Texas LNG project ("Project") rather than remand without vacatur. The panel's cursory justification for ordering vacatur departs from Circuit precedent by imposing a new, heightened standard for redressability, and also fails to meaningfully balance that factor against the gravity of the disruption vacatur would cause.

An agency is required to prepare an SEIS only when new information indicates the project in question "*will 'affec[t] the quality of the human environment'* in a significant manner or to a significant extent not already considered." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (alteration in original) (emphasis added); *see Stand Up for California! v. United States Dep't of the Interior*, 994 F.3d 616, 630 (D.C. Cir. 2021). Here, there is no serious dispute that on remand FERC's environmental-justice analysis would again "not result in any new significance determinations." JA152. Yet the panel relied on the fact that FERC

had "expanded" its analysis to not only require an SEIS, but also to deem that purported procedural misstep so "fundamental" as to prevent the Project authorization from remaining in place on remand. Op. 15, 34. That precedent-defying rule would render vacatur near-automatic in every NEPA process case.

By truncating its analysis, the panel completely disregarded the disruptive consequences of vacatur. In passing, the panel acknowledged "the significant disruption vacatur may cause the projects." Op. 34. But in the next breath, the panel found (in a single sentence) that such harm "does not outweigh the seriousness of the Commission's procedural defects." *Id.* Such scant reasoning gives short shrift to the massive upheaval that vacatur would cause, especially to the energy security of the United States and its global allies.

EQT is an anchor customer of Texas LNG, with firm commitments equal to approximately half of the terminal's nameplate capacity of 4 million tonnes per annum. Vacatur throws into question whether Texas LNG can operate the Project, which would enable the export of EQT's reliable, domestically produced low-emissions natural gas. The panel's remedial ruling also sets an alarming precedent that undermines FERC's and the U.S. Department of Energy's statutory authority as the guardians of the public interest. If left uncorrected, that ruling threatens harm to the thousands of industry participants and millions of domestic and global customers

3

that rely on stability and certainty in the build-out of critical natural gas infrastructure.

**ARGUMENT**

I.   **VACATUR UPENDS RELIANCE INTERESTS CRITICAL TO THE ORDERLY DEVELOPMENT OF NATURAL GAS INFRASTRUCTURE**

The panel's remedial ruling lacks any cognizance of key characteristics of our Nation's natural gas infrastructure.  As one of the country's largest natural gas producers, EQT's experience demonstrates that the disruptive consequences of vacating FERC approval of an integrated natural gas infrastructure project are far-reaching.

Our allies depend on the private investment of the U.S. natural gas industry to construct and operate terminals like the Project, which provide the only practical means of exporting high volumes of natural gas to global markets.  To that end, Congress in the Natural Gas Act created a rebuttable presumption in favor of approving export terminals.  It also authorizes privately-owned terminals to act in service of the public interest.

Specifically, "separate[]" from FERC's approval for the "construction or expansion of export facilities," the Natural Gas Act delegates to the Department of Energy the obligation to determine whether LNG exports from privately-owned terminals are in the public interest.  *Sierra Club v. United States Dep't of Energy*,

4

107 F.4th 1012, 1014 (D.C Cir. 2024); *see* 15 U.S.C. § 717b.  Exports to countries with which the United States has a free trade agreement "requiring national treatment for trade in natural gas" are "deemed to be consistent with the public interest," and applications must be "granted without modification or delay."  15 U.S.C. § 717b(c). Exports to countries that do not have a free trade agreement with the United States are presumed to be in the public interest, *id.* § 717b(a), and the Department is tasked with conducting an extensive "public interest" review that evaluates (among other things) economic and environmental impacts, *see Sierra Club*, 107 F.4th at 1014.

The Department completed that process before concluding in December 2020 that Texas LNG's exports would "not be[] *** inconsistent with the public interest." Order Nos. 3716-A/4489-A, at 9, *Texas LNG Brownsville LLC*, FE Docket No. 15-62-LNG (Dep't of Energy Dec. 10, 2020).  The resulting determinations, authorizing Texas LNG to export natural gas to countries with and without free trade agreements through 2050, was a primary contributing factor to EQT's decision to contract with Texas LNG.  Under a binding 20-year liquefaction tolling services agreement, Texas LNG's facility would allow EQT to export natural gas from the Appalachian Basin to customers around the globe.  That agreement furthers EQT's mission to provide energy security to the United States and lower global carbon emissions by reducing the world's reliance on coal and other carbon-intensive energy sources.

For entities like EQT, contractual certainty is essential. Natural gas production is a capital-intensive business, with the level of upstream investment determinative of access to an integrated pipeline-to-terminal system that supports customer commitments at downstream delivery points. Put another way, without certainty that they can deliver natural gas to the intended market (domestic or global), entities like EQT cannot properly decide whether to build out and invest in production and exploration facilities.

Vacatur of FERC's authorization of the Project would eviscerate that contractual certainty. EQT spent months negotiating an agreement with Texas LNG. Even setting aside the additional time and expense it would take to negotiate a new agreement with an alternative exporter, it is not clear that the required capacity even exists on other projects, much less that an alternative would present anywhere near the same economic benefits to EQT.

Finding an alternative path is further complicated in light of the Biden Administration's January 2024 "pause on new LNG approvals." Press Release, *Statement from President Joe Biden on Decision to Pause Pending Approvals of Liquefied Natural Gas Exports* (Jan. 26, 2024).[2] Under that policy reversal, the

---

[2]    https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/26/statement-from-president-joe-biden-on-decision-to-pause-pending-approvals-of-liquefied-natural-gas-exports/.

Department has refused to carry out congressionally mandated "public interest" determinations on pending applications for export of natural gas to countries with which the United States does not already have an applicable free trade agreement. That a court has preliminarily enjoined the "LNG pause" is unsurprising. *See Louisiana v. Biden*, No. 2:24-cv-406, 2024 WL 3253103 (W.D. La. July 1, 2024). The Department itself had recently touted "the investment-based expectations of private parties subject to its regulatory jurisdiction," including "the far-ranging economic investments and natural gas supply commitments associated with these authorizations over their full term—affecting both U.S. and global interests." Policy Statement Regarding Long-Term Authorizations to Export Natural Gas to Non-Free Trade Agreement Countries, 83 Fed. Reg. 28,841, 28,843 (June 21, 2018). A vacatur-style pause on the Texas LNG Project, pending remand for FERC to provide the same explanation it has already provided, has precisely the same consequences for EQT and others.

The panel's cursory remedial analysis did not acknowledge, let alone grapple with, any of the foregoing realities of the natural gas industry or of Texas LNG's specific contractual commitments. By disrupting the build-out and operation of the FERC-approved terminal, the panel blunts any beneficial aspects of Texas LNG's (and EQT's) contractual certainty, turning the acceptable business risks made when executing such agreements into unmitigable force majeures.

7

## II.  DISRUPTING THE BUILDOUT OF NATURAL GAS INFRASTRUCTURE WILL HARM CONSUMERS, THE NATION'S ENERGY SECURITY, AND THE GLOBAL CLIMATE

The increased scarcity of facility capacity caused by unnecessary vacaturs will harm the public interest that the Natural Gas Act was intended to protect.  As the Supreme Court has long recognized, the Natural Gas Act's "principal purpose" is served by "encourag[ing] the *orderly* development of *plentiful* supplies of \*\*\* natural gas at reasonable prices."  *NAACP v. Federal Power Comm'n*, 425 U.S. 662, 669-670 (1976) (emphases added).  "Other subsidiary purposes include respecting conservation, environmental, and antitrust limitations." *Sierra Club v. United States Dep't of Energy*, 867 F.3d 189, 202-203 (D.C. Cir. 2017) (internal quotation marks omitted).  Authorizations of natural gas exports track that framework and are favored absent "an affirmative showing of inconsistency with the public interest."  *Id.* at 203.

Vacatur directly undermines those statutory goals by injecting disorder into critical infrastructure development.  Make no mistake:  The panel's abstract reference to "the significant disruption vacatur may cause," Op. 34, is an incredible understatement.  By departing from this Circuit's standard for ordering vacatur, the decision drastically increases risks to customers and allies relying on the Project and the many others who depend on contractual certainty in the integrated natural gas infrastructure.  The upending of reasonable commercial expectations in this space, if allowed to stand, will reduce long-term investments necessary to produce natural

gas for the domestic market as well as for export to global allies.  That needlessly puts at risk the millions of residential households that have subscribed to natural gas services to heat their homes on the coldest days of winter.  Likewise, critical infrastructure such as hospitals, factories, and data centers also depend exclusively on natural gas as the only economic energy source available to operate their facilities.

Vacatur also undermines national goals to reduce carbon emissions, an area in which the United States had led over the last 15 years.  The switch from coal to American natural gas has driven over 60% of energy-sector reductions.[3]  In fact, coal-to-gas switching has represented the single largest contributor to the global effort to reduce carbon emissions, as natural gas produces half the amount of carbon dioxide per unit of energy than coal.[4]  The International Energy Agency recently reported that coal-to-gas switching remained the largest emissions reduction tool for the United States once again in 2023, accounting for nearly double the total energy-related emissions reductions as those attributed to renewable energy deployment.[5]

---

[3] U.S. Energy Information Administration, *U.S. Energy-Related Carbon Dioxide Emissions, 2019* (Sept. 30, 2020), https://www.eia.gov/environment/emissions/carbon/archive/2019/.

[4] U.S. Energy Information Administration, *Today in Energy* (June 9, 2021), https://www.eia.gov/todayinenergy/detail.php?id=48296.

[5] International Energy Agency, *$CO_2$ Emissions in 2023*, at 3, 14 (Feb. 2024), https://iea.blob.core.windows.net/assets/33e2badc-b839-4c18-84ce-f6387b3c008f/CO2Emissionsin2023.pdf.

At the same time the United States is successfully leveraging its natural gas resources to drive down emissions, global energy-related emissions rose 1.1%.[6] Coal use contributed to 65% of those emissions increases.  Even with historic renewable energy deployment, domestically produced natural gas that is liquefied for export remains an essential tool for reducing overall global emissions by displacing coal and other more emissions-intensive energy sources.  Delaying that transition frustrates the public interest in mitigating the climate crisis by reducing overall global emissions.  The global crisis wrought by climate change cannot be solved by limiting emissions within the borders of the U.S. only.

In addition, natural gas has been called the greatest incubator of carbon reduction technologies because it supports the development of renewable energy sources that alone are incapable of offsetting emissions from coal consumption while still ensuring adequate supplies of energy.[7]  Unnecessary disruption of key infrastructure improvements, like the one caused by the panel's vacatur orders, hinders the natural gas industry's ability to contribute positively to emissions-reductions efforts.  In fact, on October 23, 2024, EQT announced that it had fulfilled

---

[6] *Id.* at 4.

[7] U.S. Energy Information Administration, *U.S. Energy-Related Carbon Dioxide Emissions, 2019*, *supra* note 3; International Energy Agency, *Global Energy Review: CO2 Emissions in 2021* (Mar. 2022), https://iea.blob.core.windows.net/assets/c3086240-732b-4f6a-89d7-db01be018f5e/GlobalEnergyReviewCO2Emissionsin2021.pdf.

its commitment to reach net zero Scope 1 and Scope 2 GHG emissions across the company's legacy operations ahead of its 2025 goal—the first traditional energy producer of scale to do so.

Finally, natural gas plays a crucial role in ensuring our Nation's energy security. Domestically, natural gas provides about 43% of utility-scale electricity generation.[8] At the same time, U.S. power demand is expected to double by 2050 in part due to increased electrification, AI-related data center development, and onshoring of manufacturing.[9] To meet the increased power demand and mitigate power-sector emissions from prolonged coal usage, natural gas must continue to play a predictable and consistent role, particularly in serving variable loads and responding to rapid increases in demand for firm power by data centers.

Ensuring the adequate and stable supply of natural gas is also a global (and national security) concern. Two-thirds of the world's natural gas supply is concentrated in the United States, Russia, Iran, and Qatar.[10] Given the increasing global demand for natural gas due to its emissions-reduction benefits, artificially

---

[8] U.S. Energy Information Administration, *Frequently Asked Questions (FAQs): What is U.S. electricity generation by energy source?* (Feb. 29, 2024), https://www.eia.gov/tools/faqs/faq.php?id=427&t=3.

[9] U.S. Energy Information Administration, *Annual Energy Outlook AEO2023*, at 14 (Mar. 2023), https://www.eia.gov/outlooks/aeo/pdf/AEO2023_Narrative.pdf.

[10] Central Intelligence Agency, The World Factbook (2021 Archive), *Natural gas— proved reserves*, https://www.cia.gov/the-world-factbook/about/archives/2021/field /natural-gas-proved-reserves/country-comparison.

limiting the United States' ability to produce and transport it domestically empowers state actors whose actions go against our national interests. The unnecessary disruption of improvements in natural gas infrastructure caused by the panel's vacatur order only exacerbates the problem. The panel did not address any of those serious harms—let alone weigh them against the possibility that the supposed deficiencies in FERC's decision could be redressed on remand without vacatur.

\*      \*      \*

The panel's remedial ruling calls out for rehearing. The ruling fails to understand the consumer interests served by the orderly development of the Nation's integrated natural gas system, to appreciate the full extent of disruption caused by vacatur, and to meaningfully balance any of these harms, thereby effectively creating a new remand-without-vacatur standard. If left uncorrected, the panel's ruling would set a dangerous and unworkable precedent that favors vacatur of FERC approvals of natural gas infrastructure improvements—an area where disruption and disorder are particularly harmful to the public interest.

## CONCLUSION

This Court should grant the petition for rehearing.

Respectfully submitted,

/s/ *Z.W. Julius Chen*

Z.W. Julius Chen
Emily P. Mallen
Lide E. Paterno
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
chenj@akingump.com

*Counsel for* Amicus Curiae *EQT Corporation*

October 28, 2024

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and D.C. Cir. R. 28(c) because this brief contains 2,590 words, excluding the partes of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

/s/ *Z.W. Julius Chen*
Z.W. Julius Chen

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Z.W. Julius Chen*
Z.W. Julius Chen