**DECISION ISSUED AUGUST 6, 2024**

# In the United States Court of Appeals for the District of Columbia Circuit

### Nos. 23-1174, 23-1175, 23-1221 and 23-1222

————————

CITY OF PORT ISABEL, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## RESPONSE OF RESPONDENT FEDERAL ENERGY REGULATORY COMMISSION IN SUPPORT OF PETITIONS FOR PANEL REHEARING AND REHEARING *EN BANC*

————————

Matthew R. Christiansen
 General Counsel

Robert H. Solomon
 Solicitor

Robert M. Kennedy
 Senior Attorney
 robert.kennedy@ferc.gov

For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

December 9, 2024

## **TABLE OF CONTENTS**

Introduction ....................................................................... 1

Statement Of Facts............................................................. 2

Argument ........................................................................... 6

I.    The Panel's Decision Requiring A Supplemental EIS
      Is Based On An Erroneous Reading Of The Record
      And Is Contrary To Precedent ...................................... 6

      A.    The Panel's Decision Is Factually Unsupported............... 6

            1.    The Commission previously considered
                  emissions impacts within a 31-mile radius ............. 6

            2.    All identified resources were previously studied ..... 7

            3.    A page count is not indicative of
                  new information ....................................... 7

            4.    The updated data established fewer
                  air quality impacts ..................................... 8

            5.    Mitigation was imposed to address a
                  previously identified potential impact ...................... 9

            6.    The Commission reached the same conclusion ........ 9

      B.    The Panel's Decision Breaks With NEPA Precedent ...... 11

            1.    Importance of new information drives the
                  need for a supplemental EIS .................................. 11

            2.    "Will," not "might," is the standard ........................ 12

      3.     Whether to place an environmental justice
analysis in an EIS is a matter of discretion ........... 13

      4.     Demographic information alone cannot
trigger a supplemental EIS .................................... 14

  C.    The Panel's Harmless-Error Ruling Is Unsupported ...... 15

II.  The Panel's Connected-Action Holding Is Moot
And Should Be Vacated ................................................ 17

III.  The Panel's Vacatur Ruling Conflicts With
This Court's *Allied-Signal* Precedent ........................................ 19

  A.    The Panel's Test Threatens Vacatur For
Any NEPA Violation ........................................... 19

  B.    The Practical Consequences Of The
Panel's Test Are Substantial ........................................... 21

Conclusion ........................................................................ 23

# TABLE OF AUTHORITIES

## Court Cases:

*Allied-Signal, Inc. v. NRC,*
    988 F.2d 146 (D.C. Cir. 1993) ..................................................... 19

*Clarke v. United States,*
    915 F.2d 699 (D.C. Cir. 1990) .................................................... 18

*City of Oberlin v. FERC,*
    937 F.3d 599 (D.C. Cir. 2019) ................................................... 20

*Citizen Action Coal. of Ind., Inc. v. FERC,*
    No. 23-1046 .................................................................................. 22

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
    355 F.3d 678 (D.C. Cir. 2004) ................................................... 13

*Coliseum Square Ass'n, Inc. v. Jackson,*
    465 F.3d 215 (5th Cir. 2006) ..................................................... 13

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004).....................................................................20

*Env'tl Def. Fund v. FERC,*
    2 F.4th 953 (D.C. Cir. 2021).......................................................20

*Food & Water Watch v. FERC,*
    104 F.4th 336 (D.C. Cir. 2024) ..................................................22

*Friends of the River v. FERC,*
    720 F.2d 93 (D.C. Cir. 1983) ..................................................... 17

*Healthy Gulf v. FERC,*
    107 F.4th 1033 (D.C. Cir. 2024).................................................. 19

*Marin Audubon Society v. FAA,*
    No. 23-1067 (D.C. Cir. Nov. 12, 2024) ........................................ 6

*Marsh v. Oregon Nat. Res. Council,*
    490 U.S. 360 (1989) .................................................. 1, 11, 12, 15

*Nat. Res. Def. Council v. NRC,*
    879 F.3d 1202 (D.C. Cir. 2018) .................................................. 17

*Pub. Serv. Elec. & Gas Co. v. FERC,*
    989 F.3d 10 (D.C. Cir. 2021) ..................................................... 16

*Sierra Club v. FERC,*
    No. 20-1512 (2023).................................................................... 18

*Stand Up for California! v. Dep't of Interior,*
    994 F.3d 616 (D.C. Cir. 2021) ................................................... 11

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021)..................................................20

*Trenton Threatened Skies, Inc. v. FAA,*
    90 F.4th 122 (3d Cir. 2024) ...................................................... 13

*United States v. Schaffer,*
    240 F.3d 35 (D.C. Cir. 2001) ..................................................... 18

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021)............................................. 3, 7, 19

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    No. 20-1045, 2021 WL 3716769
    (D.C. Cir. Aug. 3, 2021) ........................................................ 3, 9

**<u>Administrative Cases</u>:**

*Erie Blvd. Hydropower, L.P.*,
    120 FERC ¶ 61,267 (2007) ......................................................... 12

**<u>Statutes</u>:**

Natural Gas Act
    15 U.S.C. § 717r.......................................................................... 16

National Environmental Policy Act
    42 U.S.C. § 4321 ........................................................................... 2

**<u>Regulations</u>:**

40 C.F.R. § 1501.9(e) (2021 ................................................................. 17

40 C.F.R. § 1502.7............................................................................... 8

40 C.F.R. § 1502.9 (2021) ................................................................. 15

40 C.F.R. § 1508.1............................................................................. 15

**<u>Other Authorities</u>:**

Exec. Order 12,898 § 1-101,
    59 Fed. Reg. 7629 (Feb. 11, 1994)............................................. 14

# **GLOSSARY**

| | |
|---|---|
| CCS | Carbon capture and sequestration |
| Commission or FERC | Federal Energy Regulatory Commission |
| EIS | Environmental Impact Statement |
| LNG | Liquefied natural gas |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*. |
| Op. | Opinion (D.C. Cir. Aug. 6, 2024) (Doc #2068430) |
| Projects | Collectively, the Rio Grande and Texas LNG Projects |
| Rio Bravo | Rio Bravo Pipeline Company, LLC |
| Rio Grande | Rio Grande LNG, LLC |
| Rio Grande Project | The proposed liquefied natural gas terminal and associated pipeline system being developed by Rio Grande and Rio Bravo |
| RGJA | Joint Appendix from *City of Port Isabel v. FERC*, Nos. 23-1174, *et al.* (Doc. #2045210) |
| Texas LNG | Texas LNG Brownsville LLC |
| TXJA | Joint Appendix from *City of Port Isabel v. FERC*, Nos. 23-1175, *et al.* (Doc. #2044251) |

## INTRODUCTION

The panel in this case vacated Federal Energy Regulatory Commission orders reaffirming the authorizations of the Rio Bravo pipeline and Rio Grande liquefied natural gas ("LNG") terminal ("Rio Grande Project") and the Texas LNG terminal (collectively, "Projects"). The principal basis of the panel's decision was that the Commission should have presented its updated environmental justice analysis in a supplemental Environmental Impact Statement ("EIS"), even though that analysis – which was based on data noticed for public comment, and subject to further comment via the Natural Gas Act's rehearing process – showed an improved emissions profile, and no significant impacts within the newly-considered environmental justice communities.  The Commission supports the points of error identified in the rehearing petitions filed by Intervenors Rio Grande LNG, LLC ("Rio Grande"), Rio Bravo Pipeline Company, LLC ("Rio Bravo"), and Texas LNG Brownsville LLC ("Texas LNG").

This response focuses on the panel's (1) merits determination regarding the need for a supplemental EIS, as it is unmoored from the record and based on a legal standard that departs from *Marsh v. Oregon*

*Natural Resources Council*, 490 U.S. 360 (1989), and circuit precedent,
(2) connected action ruling, which is now moot, and (3) remedial test,
which conflicts with the circuit's traditional *Allied-Signal* framework
and would threaten vacatur in virtually any case involving the National
Environmental Policy Act, 42 U.S.C. § 4321, *et seq*. ("NEPA").

## STATEMENT OF FACTS

1.      In 2015, the Commission began public outreach to resource
agencies, affected communities, government officials, and other
stakeholders regarding the Projects.  RGJA249; TXJA202.  After four
years of review, the Commission issued voluminous environmental
impact statements ("EISs") for both Projects.  In each, the Commission
examined the Projects' impacts on a resource-by-resource basis, using a
31-mile radius for air impacts, and narrower scopes for more localized
impacts, including a 2-mile radius for environmental justice impacts.
RGJA284, 292; TXJA266, 277.  The EISs concluded that there could be
significant cumulative visual impacts near the terminals (RGJA461,
TXJA321), but that environmental justice communities would not
experience any other significant impacts from the Projects.  RGJA267;
TXJA239.  In November 2019, the Commission found that the Projects

2

would be environmentally acceptable and consistent with the public interest.  RGJA467, TXJA332.

2.    Environmental groups sought review and the Court rejected all but two challenges.  As relevant here, the Court found that the Commission failed to adequately explain why the geographic scope of its environmental justice analysis was limited to two miles when emissions could cause impacts within a 50-kilometer/31-mile radius.  *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330-31 (D.C. Cir. 2021) ("*Vecinos I*").  The Court remanded the matter without vacating the Commission's authorization orders.  *Id.* at 1332.

3.    On remand, the Commission expanded the geographic scope of its environmental justice analysis to 31 miles (consistent with EPA guidance for air modeling) and compiled demographic information regarding the communities within that radius.  RGJA57, TXJA17.  And because the Rio Grande Project had undergone design changes since the EIS, the Commission solicited updated air quality data regarding both Projects.  RGJA650; TXJA449; *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, No. 20-1045, 2021 WL 3716769, at *2 (D.C. Cir. Aug. 2, 2021) ("*Vecinos II*") (noting design changes that

3

"would decrease, not increase, air emissions"). The Commission sought public input on the data and received and responded to over 150 comments. RGJA38-40, TXJA6-8.

4.    The Commission published its revised environmental justice analysis in its remand orders. As before, the analysis found that, apart from cumulative visual impacts near the terminals, impacts to environmental justice communities would not be significant. RGJA93, TXJA39. The Commission thus reaffirmed its authorization of the Projects. *Id*.

The Commission also separately approved amendments to its prior authorization of the Rio Bravo pipeline, which had undergone design changes that reduced its environmental footprint. RGJA38.

5.    Environmental groups petitioned again, and a different panel vacated and remanded the challenged orders. The panel found, although no new impacts were identified, the expanded geographic scope of the Commission's environmental justice analysis required a supplemental EIS. Op.12-17.

The panel also found that the Commission was required to review Rio Grande's intervening proposal to build a carbon capture and

sequestration ("CCS") system as a "connected action," even though the terminal can operate without it. Op.20-23. The panel further held that, even if the CCS proposal were withdrawn, the Commission would have to look at the system as a "reasonable alternative" to mitigate environmental impacts. Op.23-26

The panel ordered vacatur. It refused to consider whether the Commission's reaffirmation of its authorizations could be justified and made only a glancing reference to the "significant disruption" caused by its action. Op.34.

6.     On August 20, 2024, Rio Grande submitted a notice of intent to withdraw the CCS proposal, explaining that the system is not feasible at this time. *See* FERC Dkt. CP22-17-000 (Aug. 20, 2024). No party protested and the withdrawal became effective on September 4, 2024. *See id*. (Sept. 10, 2024).

7.     On September 13, 2024, the Commission provided notice of its anticipated schedule to address the panel's remand. The schedule contemplates issuance of a final supplemental EIS by July 31, 2025, and a final order by November 20, 2025. *See* FERC Dkts. CP16-454-000, CP16-116-000 (Sept. 13, 2024).

**8.** On November 12, 2024, in *Marin Audubon Society v. FAA*, No. 23-1067 (D.C. Cir. Nov. 12, 2024), this Court held that Council on Environmental Quality regulations are ultra vires and unenforceable. The government has petitioned for rehearing of *Marin Audubon*. Accordingly, the decision will not be addressed in this filing. The Commission would not object to having this proceeding held in abeyance pending any further proceedings in *Marin Audubon*.

## ARGUMENT

**I.    The Panel's Decision Requiring A Supplemental EIS Is Based On An Erroneous Reading Of The Record And Is Contrary To Precedent**

### A.    The Panel's Decision Is Factually Unsupported

A "combination of . . . factors" led the panel to conclude that there was enough new information in the Commission's updated environmental justice analysis to require a supplemental EIS. Op.14. Each is contradicted by the record.

#### 1.    The Commission previously considered emissions impacts within a 31-mile radius

The panel asserted that the Commission's remand analysis was "substantially different" because it "analyzed the project's impacts on communities within a fifty-kilometer radius (or thirty-one miles)."

6

Op.13.  But the original analysis of air quality – the only contested

impact extending beyond the previously-studied 2-mile radius – also

looked at impacts on communities within a 31-mile radius.  *See*

RGJA284; TXJA266; *Vecinos I*, 6 F.4th at 1330 ("the Commission

determined that impacts on air quality from each project could occur

within 31 miles").

### 2.    All identified resources were previously studied

The panel claimed the remand analysis was "new" because it

"acknowledge[d]" "potential impacts" to wetlands, recreational and

subsistence fishing, and other issues.  Op.13.  But potential impacts to

each of the resources identified by the panel were addressed in the

EISs.  Indeed, apart from emissions, the Commission's remand analysis

relied exclusively on the studies performed and conclusions reached in

the EISs.  RGJA58-65, 72-78, 83-92, TXJA18-31, 36-38.

### 3.    A page count is not indicative of new information

The panel noted that the environmental justice discussion

"expanded" from "five pages to forty-six."  Op.13.  But the difference in

length stems mainly from the fact that, for brevity, the EISs'

environmental justice analyses cross-referenced earlier discussions of

localized issues.  *See* RGJA267 ("impacts of constructing and operating the LNG Terminal on the natural and human environments are identified and discussed throughout section 4.0"); TXJA239 (same); *see also* 40 C.F.R. § 1502.7 (setting page limits for EISs).  By contrast, the remand analysis spelled out those cross-referenced discussions without changing the underlying conclusions.  RGJA58 ("the final EIS finds" potential wetland impacts); 59 ("[a]s stated in the final EIS, recreational fishing activities could be affected"), 60 ("the final EIS found" potential tourism impacts) 62 ("[t]he final EIS finds" potential traffic delays), TXJA18, 20, 21, 23 (same).

### 4. The updated data established fewer air quality impacts

The panel correctly observed that the remand analysis "relied on updated cumulative air emissions data."  Op.14.  But that data established precisely what was shown before:  no exceedances of the National Ambient Air Quality Standards within a 31-mile radius of the Projects.  RGJA66-72, 82-83, TXJA31-36.  In fact, the new data indisputably showed a reduction in air quality impacts, with substantial cuts to greenhouse gases and ozone.  RGJA28, 45, 71, 188, 456, 550, TXJA142, 145.  Earlier in this very case, the Court explained

8

that a decrease in emissions is not significant new information warranting a supplemental EIS. *See Vecinos II*, 2021 WL 3716769 at *2.

### 5. Mitigation was imposed to address a previously identified potential impact

The panel suggested that the remand analysis was based on significant new information because "the Commission ordered additional mitigation measures." Op.14. Those measures were imposed to address potential air quality impacts arising from overlapping construction and operational emissions at the terminals. That potential impact was not new information. The Commission "based its decision" on "findings" "made public years ago in the Final EIS and Authorization Order." RGJA197; TXJA151 (same). And the potential impacts would occur, if at all, within the previously-studied 2-mile radius. RGJA66-67 (impact would be "near the LNG terminal site"); TXJA31-32 (same).

### 6. The Commission reached the same conclusion

The panel claimed that the Commission's original and updated environmental justice analyses "fundamentally" "arrived at different conclusions." Opp.14. Not so. Both concluded that the *only* potentially significant impact to environmental justice communities would be

9

cumulative visual impacts near the terminals.  RGJA93, 461; TXJA39, 329.

The so-called "fundamental" change is just a tweak in language. In its initial analysis, the Commission explained that, since "all project-affected populations are minority and low-income populations, the EIS objectively concluded that impacts would not be disproportionate, but 'apply to everyone.'"  RGJA557; *see also* TXJA397-98.  The broader remand analysis also included additional non-environmental justice communities.  Within this larger radius, the Commission found that comparative impacts on environmental justice communities would be, in a numeric sense, disproportionately high and adverse because they would be predominately borne by those communities.  RGJA93; TXJA39; *see also* Arg. 1:00:30-1:01:20.

In both analyses, the Commission considered whether these communities would be uniquely susceptible to health impacts from the Project.  RGJA71, 557-61, TXJA35, 397-403.  In both, the Commission found that they would not.  *Id.*  And in both, the Commission found that cumulative visual impacts would be the only potentially significant

impact to environmental justice communities.  RGJA93, 461; TXJA39, 329.

Nothing in the record suggests that the Commission's updated environmental justice analysis reflected "a *seriously* different picture of the environmental landscape," of the type compelling a supplemental EIS.  *Stand Up for California! v. Dep't of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (internal quotation omitted).

## B.    The Panel's Decision Breaks With NEPA Precedent

The legal standard used by the panel to assess whether a supplemental EIS is required departs from settled precedent in multiple ways.

### 1.    Importance of new information drives the need for a supplemental EIS

The panel tied the need for a supplemental EIS to the volume of information before the Commission on remand, rather than what it showed.  Op.13-15.  But the import of the new information, not its mere existence, is key.  A supplemental EIS is only required where the new information "will affect the quality of the human environment in a significant manner or to a significant extent not already considered."  *Marsh*, 490 U.S. at 373-74.  Here, the original and remand analyses

11

both found that the Projects' impacts would fall on environmental justice communities, but that none would be significant apart from changes to the viewshed.

### 2. "Will," not "might," is the standard

The panel found that a supplemental EIS must be prepared whenever there "might be" significant impacts. Op.15. This lax threshold conflicts with *Marsh's* holding that a supplemental EIS is only required where new information shows that a project "will" significantly affect the environment. 490 U.S. at 374.

The panel's standard could require the Commission to engage the formal NEPA processes whenever presented with any new information regarding environmental effects. This is a sharp departure from the Commission's long-held understanding that "agencies may use non-NEPA procedures to evaluate the significance of new information . . . when determining whether a supplemental [Environmental Assessment] or EIS is required." *Erie Blvd. Hydropower, L.P.*, 120 FERC ¶ 61,267, P58 (2007) (citing *Marsh*, 490 U.S. at 383-85). Thus, the Commission does not typically invite public

12

comment on its staff's analysis of new information and deliberation of
whether it requires the supplementation of NEPA documents.

### 3.     Whether to place an environmental justice analysis in an EIS is a matter of discretion

The panel held that a supplemental EIS is required whenever new
information shows "[e]ffects on environmental justice communities."
Opp.16.  But under this Court's precedent, whether to include an
environmental justice analysis in an EIS, or present it in some other
fashion, such as the Commission order that is equally part of the
administrative record, is a matter committed to the agency's
"discretion."  *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d
678, 689 (D.C. Cir. 2004); *see also Trenton Threatened Skies, Inc. v.
FAA*, 90 F.4th 122, 138 (3d Cir. 2024) (same); *Coliseum Square Ass'n,
Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006) (arbitrary and
capricious standard of review applies when agency chooses to include
environmental justice analysis in the record).  It cannot be, therefore,
that the Commission's choice to present an environmental justice
analysis in an order, rather than a NEPA document, is grounds for
vacatur.  *See also infra* p. 17.

To be clear, environmental justice is a critical issue for the Commission. *See* RGJA167 ("[T]oday's order takes an unprecedented and bipartisan step to protect environmental justice communities"), TXJA127 (same); *see also* FERC, *Equity Action Plan* (June 2024) (https://perma.cc/XF2M-G2AD). But there is no legal requirement dictating that the analysis be presented in an EIS, especially where there are no significant environmental impacts within the affected communities.

### 4.    Demographic information alone cannot trigger a supplemental EIS

The panel separately erred in holding that information showing "[e]ffects on environmental justice communities" requires a supplemental EIS, even without corresponding "significant impacts to the physical environment." Op.16. The panel's finding is wrong because, by definition, "environmental justice impacts" are "human health or environmental effects." Exec. Order 12,898 § 1-101, 59 Fed. Reg. 7629 (Feb. 11, 1994). And *Marsh* holds that supplementation is only required where new information shows an impact to "the quality of the human environment" – *i.e.*, "the natural and physical environment,"

40 C.F.R. § 1508.1(r) – "in a significant manner" not previously

considered.  490 U.S. at 374.

Information regarding the demographics of the communities

located between 2 and 31 miles from the Projects – the only issue which

had not been considered at all before – cannot trigger a supplemental

EIS absent a corresponding significant environmental impact not

previously considered.

### C.    The Panel's Harmless-Error Ruling Is Unsupported

The panel found that the process the Commission used to present

its environmental justice analysis was prejudicial because it (1) used a

15-day comment period, rather than the 45-day period that would have

accompanied a supplemental EIS, and (2) did not "permit any public

comment on its analysis."  Op.19.  Neither point is correct.

First, the panel picked the wrong baseline to measure the

comment period.  Where, as here, the new information does not reveal a

significant impact, no comment period on the agency's documentation of

that conclusion is required.  *See* 40 C.F.R. § 1502.9(d)(4) (2021).

Second, the panel ignored the Natural Gas Act's rehearing

process, which provided parties thirty days to comment on the

Commission's analysis.  15 U.S.C. § 717r(a).  That omission is particularly significant here.

The panel's prejudice finding was based on the view that Petitioners did not have sufficient time to comment on emissions data submitted on January 6, 2023.  Op.18-19.  With a longer comment period, Petitioners "would have investigated further and submitted comments."  Op.19.  But by the time the deadline for rehearing requests expired on May 22, 2023, Petitioners had 137 days – three times the 45-day supplemental EIS comment period – to analyze the emissions data and raise any issue they saw fit.

The rehearing period also afforded Petitioners an opportunity to comment on the Commission's analysis of the emissions data.  The Commission would have been obligated to address any such comment, just as it addressed the air quality issues Petitioners chose to pursue. RGJA188-95 (responding to issues raised regarding air quality data and analysis); TXJA142-151 (same); *see also Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19-20 (D.C. Cir. 2021) ("Commission must respond meaningfully to the arguments raised before it") (internal quotation

omitted).  It thus cannot be said that "the Commission did not permit any public comment on its analysis."  Op.19.

Third, the panel's decision conflicts with *Friends of the River v. FERC*, 720 F.2d 93 (D.C. Cir. 1983).  There, the Court explained that a remand for further NEPA process would be "an insistence on form" where the Commission's orders made clear the "agency gave due consideration to the relevant environmental factors and made that consideration manifest in an accessible, intelligible form."  *Id.*  That is precisely the case here.  *See Nat. Res. Def. Council v. NRC*, 879 F.3d 1202, 1211 (D.C. Cir. 2018) ("common sense" counsels against remand where "Commission had adequately augmented its decision before being challenged in this court, and did so in a publicly accessible opinion").

## II. The Panel's Connected-Action Holding Is Moot And Should Be Vacated

The panel held that the Commission was required to consider Rio Grande's CCS proposal as a "connected action" under 40 C.F.R. § 1501.9(e)(1)(ii) (2021).  Op.23.  Rio Grande has now withdrawn that proposal without opposition.  *See supra* p. 5.  The panel correctly recognized that withdrawal would moot the connected-action issue.  Op.23.

17

Where a post-decision event moots a case before the mandate has issued, the Court must still dismiss the affected claim. *See Clarke v. United States*, 915 F.2d 699, 706 (D.C. Cir. 1990) (en banc). Its standard practice, in that circumstance, is to simultaneously vacate the affected portion of the panel decision. *Id.*; *see also United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) (en banc) (same); *Sierra Club v. FERC*, No. 20-1512 (Aug. 25, 2023) (vacating opinion where post-decision events render case moot).

Vacatur of the connected-action ruling is particularly warranted here. As the Interstate Natural Gas Association of America explains, the panel's novel connected-action ruling risks subjecting bifurcated natural gas infrastructure proposals to significant delay in the environmental review process, which could work to the detriment of the public interest. The panel's expansive interpretation of "connected actions" could discourage developers from proposing environmentally beneficial design changes for fear of having their projects significantly delayed by concurrent environmental reviews. *See* INGAA Amicus Br. 7-10 (Doc. #2082305).

### III.  The Panel's Vacatur Ruling Conflicts With This Court's *Allied-Signal* Precedent

The procedural errors identified by the panel do not touch on the Commission's conclusion, now reached twice, that the Projects are in the public interest.  Nonetheless, the panel vacated the Commission's orders.  It did so under a legal test that conflicts with precedent and ignores the particular facts of this case.

### A.    The Panel's Test Threatens Vacatur For Any NEPA Violation

For more than thirty years, this Court has analyzed the question of vacatur using two factors: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)"; and (2) the "disruptive consequences" of vacatur.  *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

In case after case, factor one assessed the likelihood that the agency could reach the same ultimate result on remand.  *See, e.g., Healthy Gulf v. FERC*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) (considering whether "Commission can redress" NEPA deficiencies "and still authorize the Project"); *Vecinos I*, 6 F.4th at 1332 (assessing whether "Commission can redress" inadequate discussion of social cost of carbon tool and environmental justice impacts "while reaching the

19

same result"); *Env'tl Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (considering whether "FERC 'chose correctly' in issuing a Certificate"); *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (assessing whether "Commission will be able to supply the explanations required" "even if the agency reaches the same result").

Drawing on *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021), the panel shifted the focus of the first *Allied-Signal* factor from the ultimate outcome of the agency proceedings, to whether the agency could justify the procedural choices made in its environmental analysis.  Op.33.  And the panel made the second *Allied-Signal* factor conditional:  disruptive consequences are now "weighty only insofar as the agency may be able to rehabilitate its rationale." Op.34 (quoting *Env'tl Def. Fund*, 2 F.4th at 976).

Of course, the agency's "rationale" – the justification for its procedural choices – would have just been reversed under a deferential standard of review.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("rule of reason" applies to agency choices under NEPA). Accordingly, the likelihood of "rehabilitation," and thus the relevance of

disruptive consequences, would seem remote.  The panel's test could

require vacatur in any case involving a purported NEPA violation.

### B.    The Practical Consequences Of The Panel's Test Are Substantial

The panel's test is triggered by an agency "bypass[ing] a

fundamental procedural step."  Op. 33.  But that hardly cabins its

scope.  Here, the Commission did not "bypass" any analysis.  It

considered environmental justice impacts twice, and planned to conduct

a full analysis of the CCS proposal when the record was adequately

developed.  Op.7-9.  The "fundamental" errors were (1) not affording

sufficient comment periods in its environmental justice analysis, and

(2) not putting the Rio Grande Project on hold to consider the CCS

modification, which was proposed two years after that Project had first

been approved.  Op.8-9, 19-20, 23.  The panel's test could apparently be

triggered by virtually any NEPA violation.

In this case, as discussed in Part I *supra*, the panel at a minimum

overstated the deficiencies of the Commission's orders.  The purported

errors were not the sort of "fundamental" failures that would outweigh

the disruption vacatur would cause.  Under either a traditional

application of *Allied-Signal*, or the panel's revised formulation, the

21

panel's balancing should have resulted in remand without vacatur, if these issues were remanded at all.

The impact of the panel's test is particularly significant in the LNG context, where, as the movants and their amici have established, vacating authorizations of large-scale energy infrastructure projects can have devasting consequences, including for the supply of LNG to United States allies in Asia and Europe. *See, e.g.*, Rio Grande Pet. 3-4, 21 (Doc. #2082499), Texas LNG Pet. 15-16 (Doc. #2081084); Rio Bravo Pet. 6-9 (Doc. #2081229).

The panel suggests that any disruption would be minimal because the Commission's task on remand should not take too long. Op.34. Developing comprehensive, legally-durable environmental reviews takes time. And, as this case demonstrates, disagreement with any of the "almost endless" "line-drawing decisions necessitated by the NEPA process" often results in further delay. *Food & Water Watch v. FERC*, 104 F.4th 336, 345 (D.C. Cir. 2024); *see, e.g.*, *Citizens Action Coal. of Ind., Inc. v. FERC*, No. 23-1046 (argued May 7, 2024) (challenging authorization of pipeline project that would facilitate replacement of coal power plant, resulting in net emissions reduction).

22

## CONCLUSION

For the foregoing reasons, the Court should grant the petitions for

rehearing filed by Rio Grande, Rio Bravo, and Texas LNG.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

Federal Energy Regulatory
   Commission
Washington, D.C.  20426
Tel.: (202) 502-8904
Email: robert.kennedy@ferc.gov

December 9, 2024

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this filing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this filing contains 3,894 words, excluding the parts of the filing exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this filing complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

Federal Energy Regulatory
    Commission
Washington, D.C.  20426
Tel.: (202) 502-8904
Email: robert.kennedy@ferc.gov

December 9, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on December 9, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney